GENEVIEVE B. WALKER, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 2018-64. Filed August 22, 1966.

*Thomas R. Ward, Vincent F. Kilborn,* and *Roland J. Mestayer, Jr.,* for the petitioner.

*William V. Crosswhite,* for the respondent.

ATKINS, *Judge:* The respondent, by notice of deficiency dated February 19, 1964, determined a deficiency in income tax for the taxable year 1957 in the amount of $81,075.05.

The primary issue is whether assessment of any deficiency for 1957 is barred by the statute of limitations which in turn depends upon whether, within the purview of section 6501(e) of the Internal Rev-

---

enue Code of 1954, the petitioner omitted from gross income an amount properly includable therein which is in excess of 25 percent of the gross income stated in her return. If assessment is not barred by the statute of limitations, there remains only the issue whether a partnership of which the petitioner was a member was entitled to report on the installment basis the gain derived from the sale of certain assets in 1957, and hence whether the petitioner reported her proper distributive share of the gain on such sale.

FINDINGS OF FACT

Some of the facts have been stipulated and are incorporated herein by this reference.

The petitioner, a resident of Pascagoula, Miss., filed her Federal income tax return for the taxable year 1957 on October 15, 1958, with the district director of internal revenue in Jackson, Miss.

In 1944 petitioner and her then husband, Arnold V. Walker, formed a partnership under the name of Arnold V. Walker Shipyard (hereinafter sometimes referred to as the partnership). She and her husband were equal partners in the partnership during 1957 and for a number of years prior thereto. The partnership operated a shipyard in Pascagoula continuously from 1944 through January 1957. The partnership filed its Federal income tax return for the taxable year 1957 on October 14, 1958, with the district director of internal revenue in Jackson, Miss.

Petitioner and Walker separated in February 1957 and were divorced in June 1957.

During the latter part of 1956 and early 1957, negotiations were carried on between the partnership and the Ingalls Shipbuilding Corp. (hereinafter sometimes referred to as Ingalls), for the purchase by Ingalls of substantially all of the partnership's assets. Ingalls was in the business of constructing ships and had a large shipyard on the Pascagoula River at Pascagoula. It was a wholly owned subsidiary of the Ingalls Iron Works Co., which was engaged in the business of fabricating steel in Birmingham, Ala.

In the course of the negotiations several conferences were held between the partnership, represented by Arnold V. Walker and others, and Ingalls, represented by various of its and its parent's officials. In December 1956 Donald W. Strickland, vice president and general counsel of Ingalls and its parent, after discussing the proposed terms of sale with Walker and W. R. Guest, president of Ingalls, drafted a proposed agreement which reflected the then understanding of the parties. Such proposed agreement provided, *inter alia*, that the Walkers would set up a corporation to be known as Arnold V. Walker Shipyard, Inc., with capital stock of 3,000 common shares of par value of $100 each and transfer to it the partnership's shipyard

properties, both real and personal, with certain exceptions; that the corporation would assume the existing indebtedness of the Walkers to a bank in the estimated amount of $285,000 which was secured by a first mortgage or deed of trust on the properties of the partnership; that the corporation would pay in cash the appraised value of the inventories and stores of materials; that the corporation would issue to the Walkers all its stock in proportion to their partnership interests; that the Walkers would then sell to Ingalls all the shares of stock of the corporation in consideration of the payment to them by Ingalls of an amount equal to $900,000 (reduced by the amount of the above indebtedness at time of transfer and accrued and unpaid interest thereon); and that $175,000 of such consideration would be paid at the time of transfer and delivery of the stock (less an amount of $500 to be paid by Ingalls upon the signing of the agreement), and that the balance would be payable in 120 equal monthly installments (with interest at 5 percent) commencing 1 month after the date of transfer, such balance to be evidenced by promissory notes of Ingalls. Therein the Walkers represented and warranted that immediately after the transfer of the property to the corporation and the transfer of the corporate stock to Ingalls they, individually or doing business through the partnership, would not owe any debts or have any unsettled claims or liabilities against them whatsoever (other than the mortgage debt referred to above) which might be lawfully claimed or asserted against the corporation or Ingalls or constitute a lien against the property or stock.

The above-proposed agreement was not executed. However, on January 8, 1957, the Walkers and Ingalls executed an agreement which, insofar as material herein,[1] contained substantially the same provisions, except that it provided that $500, rather than $175,000, of the agreed purchase price should be paid by Ingalls to the Walkers at the time of the transfer and delivery of the stock by the Walkers to Ingalls. Such change in the amount of the initial payment was made at the request of Arnold V. Walker.[2]

---

[1] The provision for transfer of inventories and stores of material was not included but was made the subject of another contract as of the same date, and on the same date Ingalls agreed to make available to the corporation sufficient funds to permit the corporation to pay the Walkers cash therefor.

[2] At a time not precisely shown by the record, but prior to Jan. 8, 1957, Cecil McGee, an accountant who had assisted in obtaining a Small Business Administration loan for the Walkers, resulting in the mortgage indebtedness above mentioned, who was doing tax work for the partnership in 1956 and 1957, and who had attended some of the above conferences as a representative of the partnership, advised the partnership's comptroller to the effect that for the purpose of determining whether the sale of mortgaged property would qualify as an installment sale for tax purposes, irrespective of whether the property is taken subject to the mortgage or whether the mortgage is assumed by the purchaser, the amount of the mortgage in excess of the basis of the property would be considered as a payment made by the purchaser to the seller in the year of the sale. Sec. 1.453–4(c), Income Tax Regs., in effect so provides. See also *Burnet* v. *S. & L. Bldg. Corp.*, 288 U.S. 406, which sustained a prior regulation to the same effect. In the latter part of 1956 and the early part of 1957, McGee, as a result of his prior work on the returns of the partnership, knew the approximate book value of the assets of the partnership.

The Walkers and Ingalls also entered into another agreement on January 8, 1957 (hereinafter referred to as the loan agreement), which provided in part as follows:

The Walkers contemplate organizing a Corporation to be named "Arnold V. Walker Shipyard, Inc.," and have contracted with Ingalls relative to the sale of the stock of said Corporation, all of which is to be transferred to Ingalls in conformity with the provisions of the contract between the parties dated January 8th, 1957.

Ingalls agrees that simultaneously with the transfer of the stock to and acceptance of same by it, that it will loan to the Walkers the sum of $300,000.00, of which amount the Walkers shall pay on the indebtedness to the Pascagoula-Moss Point Bank or holder thereof, which indebtedness is secured by first mortgage on the property known as the "A. V. Walker Shipyard in the City of Pascagoula, Mississippi," the sum of $20,000.00; the said loan shall be evidenced by one hundred and twenty (120) promissory notes of equal amount executed by the Walkers and payable to Ingalls monthly, the same to provide for the payment of interest at the rate of 5% per annum amortized and to be secured by pledge of a sufficient number of the last maturing notes executed by Ingalls and payable to the Walkers in pursuance of the contract aforesaid to aggregate the $300,000.00. It being understood that in the event default is made in the payment of any one of the said Walker notes or the failure of compliance by the Walkers with any of the terms and provisions of the contract aforesaid, that Ingalls or the holder of said notes may declare the balance to be due and payable and apply its notes which are held as collateral to the payment thereof.

The contemplated corporation, Arnold V. Walker Shipyard, Inc., was duly organized and the contemplated transfers were effected. Two promissory notes, each dated January 24, 1957, were given by Ingalls to the Walkers. One of such notes was in the amount of $334,011.34, bore interest at the rate of 5 percent per annum, and was payable in 59 monthly installments of $5,567 each and a final installment of $5,558.34, the first installment to be due and payable on February 24, 1957. The other note was in the amount of $300,000, bore interest at 5 percent per annum, and was payable in 60 monthly installments of $5,000 each, the first installment being due on February 24, 1962.

At the closing of the sale the Walkers also received from Ingalls a check in the amount of $300,000 pursuant to the provisions of the loan agreement of January 8, 1957. They thereupon both individually and as partners executed in favor of Ingalls on January 24, 1957, a promissory note in the amount of $300,000, bearing interest at the rate of 5 percent per annum, and payable in 60 monthly installments of $5,000 each, the first payment to be due and payable on February 24, 1962. The Walkers deposited and pledged with Ingalls as collateral security for the payment of such note the above-mentioned note of Ingalls in the amount of $300,000.

The check for $300,000 thus obtained from Ingalls was placed in an escrow account in the Pascagoula-Moss Point Bank and the proceeds

were disbursed in accordance with a letter of instructions dated January 25, 1957, addressed to such bank and signed by the president of Ingalls and the Walkers individually and as partners. Such letter of instructions authorized and directed the bank to deposit the amount of the check in a special escrow account and to disburse the same by first paying certain liabilities of the partnership in the aggregate amount of $255,369.09, then paying other debts of the partnership or of the Walkers if and as directed and then paying the balance, if any, to the Walkers individually and as partners.

Ingalls on its books of account reflected the $300,000 payment to the Walkers as a "note receivable." The $300,000 note of Ingalls which was pledged by the Walkers to Ingalls as security was reflected as a "note payable" on the books of account of Ingalls. No interest or installment payments were made by the Walkers individually or as partners on the $300,000 note payable to Ingalls. Similarly, there were no interest or installment payments made by Ingalls on the $300,000 note payable to the Walkers. On July 30, 1962, a journal voucher was prepared by Ingalls crediting the note receivable account in the amount of $300,000 and debiting the note payable account in the amount of $300,000, with the explanation "To cancel A. V. Walker's note receivable and note payable * * *," and corresponding entries were made on Ingalls' ledger accounts.

In the partnership return for the taxable year 1957 it was disclosed that the partners were the petitioner and Arnold V. Walker and that they shared equally in partnership gains and losses. Such return showed net long-term capital gain of $172,604.47. Included was a long-term capital gain of $200,324.22 described as "Installment Sale Scheduled." Attached to the return was the following schedule entitled "Sale of Property on the Installment Method":

| | | |
|---|---|---|
| Selling price: | | |
| Notes received | | $634,011.34 |
| Interest paid Small Business Administration by vendee for the account of vendor | | 1,186.66 |
| Assumption by vendee of mortgage note issued by vendor in favor of Small Business Administration | | 264,802.00 |
| | | 900,000.00 |
| Basis: | | |
| Cost | $235,094.44 | |
| Less: Accumulated depreciation | 108,997.51 | $126,096.93 |
| Selling expense | | 2,992.80 | 129,089.73 |
| Total (gross) profit | | 770,910.27 |
| Total contract price: | | |
| Cash and notes | 635,198.00 | |
| Excess of mortgage over basis | 138,705.07 | 773,903.07 |

Gross profit ratio____ $770, 910. 27/$773, 903. 07          99. 6%
Payment in year of sale:
  Interest payment by vendor to Small Business
    Administration for the account of vendor_____   $1, 186. 66
  Excess of mortgage assumed over basis_____   138, 705. 07
  Installments received_____     61, 237. 00   $201, 128. 73

Ratio of payments in the year of sale to selling price_____   22. 348%
Collections received in taxable year (same as payments in the
  year of sale above)_____   $201, 128. 73
Includable in Schedule D under Code sec. 453 (99.6%)_____   200, 324. 22

The partnership return for such taxable year contained the following balance sheets:

### BALANCE SHEETS

| Assets | Jan. 1, 1957 | | Dec. 31, 1957 |
|---|---|---|---|
| Cash on hand and in banks_____ | $35, 127. 27 | | $21, 854. 69 |
| War bonds_____ | 3, 000. 00 | | 0 |
| Accounts and contracts receivable__ | 397, 224. 48 | | 195, 482. 35 |
| Land_____ | 16, 000. 00 | | 0 |
| Plant and equipment_ $602, 468. 14 | | $26, 000. 00 | |
| Reserve for deprecia- | | | |
| tion_____ 287, 379. 85 | 315, 088. 29 | 21, 650. 00 | 4, 350. 00 |
| Sundry loans_____ | 8, 813. 30 | | 238. 06 |
| Inventory_____ | 189, 949. 57 | | |
| Notes receivable_____ | 40, 000. 00 | | 572, 774. 34 |
| Airline deposits_____ | 425. 00 | | |
| Sundry investments_____ | ----------- | | 3, 545. 00 |
| Total_____ | 1, 005, 627. 91 | | 798, 244. 44 |
| Liabilities | | | |
| Accounts payable_____ | $237, 639. 48 | | $122. 98 |
| Notes payable_____ | 581, 092. 17 | | 300, 000. 00 |
| Payroll and sales tax payable_____ | 6, 686. 71 | | 0 |
| Guaranty deposits_____ | 42, 949. 53 | | 0 |
| Due employees_____ | ----------- | | 391. 50 |
| Total liabilities_____ | 867, 912. 89 | | 300, 514. 48 |
| Deferred income_____ | | | 570, 586. 05 |
| Capital | | | |
| Arnold V. Walker_____ $105, 818. 00 | | (19, 742. 47) | |
| Genevieve B. Walker__ 31, 897. 02 | 137, 715. 02 | (53, 113. 62) | (72, 856. 09) |
| Total. _____ | 1, 005, 627. 91 | | 798, 244. 44 |

In her return for the taxable year 1957 the petitioner set forth as her occupation "Partner Arnold V. Walker Shipyard." Therein she reported net long-term capital gain of $61,418.80. Included in the schedule of capital gains and losses was an amount of $86,302.24 described as her share of long-term capital gain from "partnerships and fiduciaries." This amount is one-half the amount reported by the partnership as its taxable net long-term capital gain for the taxable year 1957, such amount having been computed by the partnership by taking into account for 1957, pursuant to the installment method, only $200,324.22 as the gain to be reported for that year from the transaction with Ingalls.

In determining the deficiency the respondent treated the above-described transaction as a sale, not on the installment basis, by the partnership of its property to Ingalls. He determined that the partnership had a long-term capital gain from the transaction in the amount of $720,957.10,[3] and that the full amount thereof should have been reported as taxable in 1957. He therefore determined that for 1957 the partnership had net long-term capital gain of $693,237.35, of which the petitioner's share was $346,618.67 instead of $86,302.24 as reported by her. This in turn, together with an uncontested increase of $125.42 in her reported capital gains, resulted in the determination that for 1957 she had net long-term capital gain of $321,860.65 instead of $61,418.80, as reported by her.

OPINION

The petitioner has pleaded the bar of the 3-year statute of limitations provided in section 6501(a) of the Internal Revenue Code of 1954. The respondent contends that the 6-year period of limitations provided in section 6501(e) is applicable, since, he contends, the petitioner omitted from gross income an amount properly includable therein which is in excess of 25 percent of the amount of gross income stated in the return, and that hence the notice of deficiency was timely.[4]

---

[3] The difference between the $720,957.10 gain on the transaction determined by the respondent and the gross profit of $770,910.27 computed in the partnership return is explained by the respondent on brief as follows: "the respondent used a lower amount of accumulated depreciation with respect to the property covered by the SBA mortgage thereby reducing the gain from the sale of the assets to Ingalls."

[4] Sec. 6501 of the Code provides, in part, as follows:

SEC. 6501. LIMITATIONS ON ASSESSMENT AND COLLECTION.

(a) GENERAL RULE.—Except as otherwise provided in this section, the amount of any tax imposed by this title shall be assessed within 3 years after the return was filed (whether or not such return was filed on or after the date prescribed) * * * and no proceeding in court without assessment for the collection of such tax shall be begun after the expiration of such period.

* * * * * * *

(e) OMISSION FROM GROSS INCOME.—Except as otherwise provided in subsection (c)—

(1) INCOME TAXES.—In the case of any tax imposed by subtitle A—

(A) GENERAL RULE.—If the taxpayer omits from gross income an amount properly includible therein which is in excess of 25 percent of the amount of gross income stated in the return, the tax may be assessed, or a proceeding in court for the collec-

The petitioner has established that the notice of deficiency was mailed more than 3 years after the date of the filing of her return. In such situation the respondent has the burden of proving that there was an omission by the petitioner from gross income which would result in the applicability of the 6-year statute of limitations provided by section 6501(e). *Edward F. Webber*, 21 T.C. 742, affd. (C.A. 10) 219 F. 2d 834; and *C. A. Reis*, 1 T.C. 9, affd. (C.A. 6) 142 F. 2d 900.

It is the respondent's position that the partnership, and hence the petitioner, was not entitled to report the gain from the transaction with Ingalls [5] on the installment basis and that consequently the petitioner, in reporting in her return for 1957 only $61,418.80 as her net long-term capital gain for that year, understated her gross income by $260,441.85, which is in excess of 25 percent of the gross income reported in her return. He further contends that such omission was not disclosed in her return, nor in any statement attached to her return, nor in any other related return in a manner adequate to apprise him of the nature and amount of the omitted item. The petitioner contends that the partnership properly reported the gain upon the transaction on the installment basis, and that the respondent, upon whom rests the burden, has not shown facts to establish that the use of such method was improper. She concedes that if the partnership was not entitled to report the sale on that method she omitted from her gross income an amount which was in excess of 25 percent of the amount of gross income stated in her return, but that, nevertheless, in view of the provisions of section 6501(e)(1)(A)(ii), such amount would not be taken into account in determining the amount omitted from gross income, within the intendment of the statute, for the reason that such amount was disclosed in the partnership return in a manner adequate to apprise the respondent of the nature and amount of such item. The respondent concedes in the stipulation and on brief, and we think properly so, that information contained in the partnership return should be taken into consideration in determining whether any omitted

---

tion of such tax may be begun without assessment, at any time within 6 years after the return was filed. For purposes of this subparagraph—

\* \* \* \* \* \* \*

(ii) In determining the amount omitted from gross income, there shall not be taken into account any amount which is omitted from gross income stated in the return if such amount is disclosed in the return, or in a statement attached to the return, in a manner adequate to apprise the Secretary or his delegate of the nature and amount of such item.

[5] In form the transaction consisted of a transfer by the Walkers, individually and as partners, of partnership assets to a corporation which assumed the mortgage indebtedness, the Walkers receiving the stock of the corporation and then selling such stock to Ingalls. Both the partnership and the petitioner in the returns for the year 1957, and the respondent in the deficiency notice, treated the transaction as being in substance a sale by the partnership of assets directly to Ingalls and an assumption by Ingalls of the mortgage indebtedness. Thus, on brief the respondent states that the corporation was formed solely for technical reasons to effect the sale of the shipyard assets to Ingalls. Under the circumstances, we accept the substance of the transaction as being a sale by the partnership of its assets directly to Ingalls.

amount was disclosed in the return in a manner adequate to apprise him of the nature and amount of such item. See *Elliott J. Roschuni*, 44 T.C. 80; and *Jack Rose*, 24 T.C. 755. See also Rev. Rul. 55–415, 1955–1 C.B. 412. He contends, however, that neither the petitioner's return nor the partnership return contains the requisite disclosure.

The respondent's position that the partnership was not entitled to report the gain from the transaction with Ingalls on the installment method under section 453 of the Code,[6] is primarily based upon his contention that, under the principle of *Gregory* v. *Helvering*, 293 U.S. 465, *Commissioner* v. *Court Holding Co.*, 324 U.S. 331, and other cases, the $300,000 received at the time of sale by the Walkers from Ingalls, which purported to be a loan, was in substance a payment on the purchase price, and that therefore in the taxable year of the sale the payments received exceeded 30 percent of the selling price of the property.[7] And his position that there was not an adequate disclosure in the returns is based upon the claim that from them he could not determine that use of the installment basis was improper since such returns did not disclose that at the time of the sale Ingalls had advanced an amount of $300,000 to the Walkers purportedly as a loan evidenced by a note in the same amount and payable on the same terms

---

[6] Sec. 453 provides, in part, as follows:

SEC. 453. INSTALLMENT METHOD.

(a) DEALERS IN PERSONAL PROPERTY.—Under regulations prescribed by the Secretary or his delegate, a person who regularly sells or otherwise disposes of personal property on the installment plan may return as income therefrom in any taxable year that proportion of the installment payments actually received in that year which the gross profit, realized or to be realized when payment is completed, bears to the total contract price.

(b) SALES OF REALTY AND CASUAL SALES OF PERSONALTY.—

(1) GENERAL RULE.—Income from—

(A) a sale or other disposition of real property, or

(B) a casual sale or other casual disposition of personal property (other than property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year) for a price exceeding $1,000,

may (under regulations prescribed by the Secretary or his delegate) be returned on the basis and in the manner prescribed in subsection (a).

(2) LIMITATION.—Paragraph (1) shall apply—

(A) In the case of a sale or other disposition during a taxable year beginning after December 31, 1953 (whether or not such taxable year ends after the date of enactment of this title), only if in the taxable year of the sale or other disposition—

(i) there are no payments, or

(ii) the payments (exclusive of evidences of indebtedness of the purchaser) do not exceed 30 percent of the selling price.

[7] In the taxable year of the sale there were received payment of 11 installments totaling $61,237; an amount of $1,186.66 paid on an obligation of the partnership; and an amount of $138,705.07 representing the excess of the amount of mortgage indebtedness assumed over the basis of the property. If the $300,000 received were considered a payment received in the year of the sale the result would be that a total of $501,128.73 was received which is, of course, far in excess of 30 percent of the selling price of $900,000. The respondent states alternatively that if there was a bona fide loan of $300,000, there was, under sec. 453(d), a disposition of an installment obligation when the Ingalls note was used as collateral security for the loan (Rev. Rul. 65–185, 1965–2 C.B. 153) and that the gain realized upon such disposition should be included as a payment in the year of sale, thereby precluding use of the installment method because of the 30 percent limitation of sec. 453(b)(2)(A). The respondent does not raise the issue whether the gain on such disposition itself constituted an item of omitted income for purposes of the application of sec. 6501(e)(1)(A).

and dates as a note given by Ingalls to the Walkers as a part of the purchase price and that the Ingalls note was pledged with Ingalls as security for the alleged loan.

We find it unnecessary to decide whether the use of the installment method was proper. Even if it be assumed *arguendo* that the partnership was not entitled to report the gain upon the sale on the installment method, and that as a result thereof there was omitted from the petitioner's gross income an amount properly includable therein which was in excess of 25 percent of the amount of the gross income stated in her return, we, nevertheless, are of the opinion that such amount should not be taken into account since we think such amount was, within the meaning of section 6501(e)(1)(A)(ii), disclosed in the return in a manner adequate to apprise the respondent of the nature and amount of such item.

The item claimed to have been omitted from gross income is the difference between the amount shown by the petitioner in her return as net long-term capital gain (considering the sale in question as an installment sale) and the amount which the respondent determined she should have reported as net long-term capital gain (treating the sale in question as not an installment sale). However, the return filed by the partnership disclosed the gross profit derived or to be derived from the sale and the portion thereof treated as income in the year of sale. It thus disclosed the amount which would be considered gross income omitted if the use of the installment method was not proper. And, of course, it disclosed the nature of the item—long-term capital gain from the sale of property. Under similar circumstances we held in *Elliott J. Roschuni, supra,* that the amount claimed to have been omitted was disclosed in a manner adequate to apprise the respondent of the nature and amount of such item and that therefore, pursuant to section 6501(e)(1)(A)(ii), such amount was not to be taken into account in determining the amount omitted from gross income. It is true, as pointed out by the respondent, that in the *Roschuni* case the return on its face contained information indicating that use of the installment method was not proper. However, the decision in that case was not predicated upon such fact, but upon the fact that there was sufficient information disclosed in the return to permit the computation of the proper amount of gain on the completed basis. Here (in the partnership return) as in that case (in the return of an electing small business corporation) the "explanation was adequate to apprise the respondent of the nature and amount of what the gain would be on the sale * * * on a *completed* basis rather than an *installment* basis."

Our conclusion is, we believe, proper in the light of the view expressed by the Supreme Court in the case of *Colony, Inc.* v. *Commissioner,* 357 U.S. 28. In that case the Court considered the basic

purpose of section 275(c) of the Internal Revenue Code of 1939, which contained substantially the same language as section 6501(e)(1)(A) except for certain provisions, including the provision contained in section 6501(e)(1)(A)(ii) that there shall not be taken into account any omitted amount if such amount is disclosed in a manner adequate to apprise the respondent of the nature and amount of such item. In that case the taxpayer had accurately reported its gross receipts but, due to the overstatement of the basis of certain lots, it had understated the gross profit on the sales thereof. In holding that under the circumstances there presented there was no omission from gross income within the meaning of section 275(c), the Supreme Court stated in part:

We think that in enacting § 275(c) Congress manifested no broader purpose than to give the Commissioner an additional two years [3 years under the 1954 Code] to investigate tax returns in cases where, because of a taxpayer's omission to report some taxable item, the Commissioner is at a special disadvantage in detecting errors. In such instances the return on its face provides no clue to the existence of the omitted item. *On the other hand, when, as here, the understatement of a tax arises from an error in reporting an item disclosed on the face of the return the Commissioner is at no such disadvantage. And this would seem to be so whether the error be one affecting "gross income" or one, such as overstated deductions, affecting other parts of the return.* * * * [Emphasis supplied.]

And in *Davis* v. *Hightower* (C.A. 5), 230 F. 2d 549, which also involved the application of section 275(c) of the 1939 Code, it was held that where a taxpayer arrives at an incorrect computation of tax only by reason of a difference between him and the respondent as to the legal construction to be applied to a disclosed transaction, the difference between the correct and the incorrect item is not to be considered as an omission from gross income.[8]

In view of the foregoing, we hold that assessment of any deficiency for the taxable year 1957 is barred by the statute of limitations.

*Decision will be entered for the petitioner.*

---

[8] In *Davis* v. *Hightower*, the taxpayer reported as taxable gain only 50 percent of gain from sales of cotton, on the ground that the sales were sales of capital assets, whereas later the respondent determined that the gains were taxable in their entirety on the ground that they represented gains from sales of property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business. The court there stated in part:

"The only way in which the taxpayer here could satisfy the government's requirement that he state his 'gross income' in a way to permit a tax computation of the amount the government claims is due, would be for him to abandon his claim that he was entitled to capital gains treatment of the sales in question. No such penalty was intended by Congress in extending the statutory period to five years in case of substantial omission. It cannot be thought that if a taxpayer accurately fills in every blank space provided for his use in the income tax form, giving every 'gross' or maximum figure called for, and arrives at an incorrect computation of the tax only by reason of a difference between him and the Commissioner as to the legal construction to be applied to a disclosed transaction, the use of a smaller figure than that ultimately found to be correct in one stage of the computation amounts to an omission from 'gross income' of the difference between the correct and incorrect item."