HULAN E. RUTLAND, ET AL.,[1] Petitioners *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 42535-84, 42536-84,    Filed December 8, 1987.
42537-84, 42538-84,
42539-84, 42540-84.

---

[1]Cases of the following petitioners have been consolidated herewith: Leonard Matthews, docket No. 42536-84; Robert P. McCracken, docket No. 42537-84; James B. Rutland, docket No. 42538-84; J. David Woodard, docket No. 42539-84; and Matthews-McCracken-Rutland Corp., docket No. 42540-84.

*Katherine W. King* and *William G. Whatley,* for the petitioners.

*J. Darrel Knudtson,* for the respondent.

SIMPSON, *Judge:* The Commissioner determined identical deficiencies in each of the individual petitioner's Federal excise taxes as follows:

| Year | Deficiency |
|---|---|
| 1976 | $21,508.32 |
| 1977 | 23,028.47 |
| 1978 | 24,548.62 |
| 1979 | 25,426.67 |
| 1980 | 24,131.43 |
| 1981 | 21,500.00 |

The Commissioner also determined a deficiency in the Federal excise taxes of petitioner Matthews-McCracken-Rutland Corp. as follows:

| TYE May 31— | Deficiency |
|---|---|
| 1977 | $750 |
| 1978 | 2,550 |
| 1979 | 4,350 |
| 1980 | 6,150 |
| 1981 | 6,150 |

The issues for our decision are: (1) Whether the sale of property by the individual petitioners to an employee stock bonus plan and the subsequent lease of such property by such plan to the corporate petitioner constituted prohibited

transactions under section 4975(c), Internal Revenue Code of 1954;[2] (2) whether the petitioners are disqualified persons under section 4975(a); (3) whether the Commissioner's calculations of the excise taxes owed by the petitioners are proper and accurate; (4) whether the Commissioner is barred by the statute of limitations from assessing the deficiencies in Federal excise taxes determined by him with respect to the petitioners; and (5) whether section 4975 imposes a penalty referred to in section 6601(e)(3)[3] so as to delay the accrual of interest on any deficiency until after the Commissioner has issued a notice and demand for payment of such deficiency.

## FINDINGS OF FACT

Some of the facts have been stipulated, and those facts are so found.

At the time the petitions were filed in this case, petitioners Hulan E. Rutland, Robert P. McCracken, and James B. Rutland resided in Baton Rouge, Louisiana; petitioner Leonard A. Matthews resided in Prairieville, Louisiana; and petitioner J. David Woodard resided in Atlanta, Georgia. Petitioner Matthews-McCracken-Rutland Corp. (MMR) was formed under the laws of the State of Louisiana and maintained its principal place of business in Baton Rouge, Louisiana. All the individual petitioners reported their income on a calendar year basis. MMR reported its income using a tax year ending May 31. We shall identify a tax year by the calendar year in which it ends.

In September 1972, Mr. McCracken acquired a controlling interest in MMR, which provided instrumentation and electrical engineering services to the construction industry. All individual petitioners were officers and employees of MMR at some time.

After Mr. McCracken acquired control of MMR, the company developed into a successful business. As MMR grew, Mr. McCracken decided to build an office and factory complex in a highly visible area, so that industrial clients

---

[2] All statutory references are to the Internal Revenue Code of 1954 as in effect during the years in issue, unless otherwise indicated.

[3] The Tax Equity and Fiscal Responsibility Act of 1982, Pub. L. 97-248, sec. 344(b), 96 Stat. 635, redesignated sec. 6601(e)(3) as sec. 6601(e)(2).

could become familiar with the company. For such reason, he, along with the other individual petitioners, purchased approximately 3 acres of land in Baton Rouge. They built an office building, a warehouse building, and a shop building and set up an equipment yard on such land (the property). After its completion, the property was used to house the corporate offices of MMR.

On May 31, 1975, MMR established the Matthews-McCracken-Rutland Corp. Employee Stock Bonus Plan (the bonus plan). Such plan was amended in September 1977, to conform to the provisions of the Employee Retirement Income Security Act of 1974 (ERISA), Pub. L. 93-406, 88 Stat. 829, and its name was changed to the Matthews-McCracken-Rutland Corp. Employee Stock Ownership Plan (the ESOP). For convenience, we shall refer to both the bonus plan and the ESOP as the plan. On March 27, 1978, the Commissioner issued a determination letter stating that the plan was a trust under section 401(a) which is exempt from taxation under section 501(a).

The plan participants were all employees of MMR. The plan provided for an individual account for each participant and for benefits based solely on the amount contributed to such participant's account.

On December 17, 1976, a special meeting of the board of directors of MMR was held to grant the plan the authority to invest in "qualifying employer real property" and "qualifying employer securities" and to allow plan participants to designate investments for the plan assets in their account. The plan was also amended to provide that an administrative committee, consisting of all officers and employees of MMR who were plan participants, be appointed to administer the plan.

On December 30, 1976, the individual petitioners sold the property to the plan. Before doing so, the petitioners hired three independent appraisers to prepare estimates of the fair market value of the property. Based upon such appraisals, the plan paid $430,000 for the property. It is stipulated that the fair market value of the property on the date of purchase was $430,000.

The plan purchased the property for a cash payment of $100,000 and a promissory note and mortgage issued by the

plan in favor of the sellers for $189,363.64. Further, the plan assumed a note and mortgage on the property which originally had been executed by the individual petitioners. Such note and mortgage had an outstanding balance of $140,636.36 at the time of the purchase.

On January 3, 1977, the plan leased the property to MMR. Under such lease, MMR paid rent of $3,000 per month to the plan and paid the taxes, insurance premiums, and maintenance on the property. The lease was granted for a 3-year term, beginning on January 3, 1977, with options to renew at the same rent. The plan received total rental income from MMR of $123,000 from January 1977 through May 1980.

No person received any commission for arranging the sale of the property to the plan. On May 31, 1977, the book value of all the assets in the plan was $507,536.43. On such date, the plan had total liabilities of $328,472.66.

In 1978, the petitioners became aware of the possibility that the sale and lease of the property were prohibited transactions. On October 23, 1978, they mailed to the Department of Labor and to the IRS an application for exemption from the prohibited transaction restrictions of ERISA.

The application contained information as to the nature and circumstances of the transaction. It indicated that the individual petitioners sold the property to the plan and that such individuals were members of the plan's administrative committee. It disclosed the purchase price of the property and the fact that the plan acquired such property by paying cash, issuing a promissory note to the sellers, and assuming the outstanding mortgage on the property. Such application also disclosed the terms of the lease between MMR and the plan. The application concluded by stating that all such transactions may constitute prohibited transactions and that the petitioners were disqualified persons under ERISA. Such application was received by the IRS on November 24, 1978.

In a letter dated April 10, 1980, the Labor Department notified the petitioners' counsel that such application for exemption was formally denied. Such letter indicated that the application was denied because the transactions involved a high percentage of plan assets and because the

"inherent conflict of interest" raised by the transaction creates "the potential for possible abuse."

On June 4, 1980, the sale of the property was rescinded at the suggestion of the Labor Department. At such time, the property was returned to Mr. McCracken and James Rutland in exchange for $430,000. There is no evidence in the record as to the fair market value of the property at such time. On December 15, 1982, Mr. McCracken and James Rutland paid $20,000 to the plan as additional compensation for the rescission of the sale of the property. Such amount was paid at the suggestion of the IRS, which indicated that, without such payment, it would assess the petitioners a 100-percent excise tax under section 4975(b). It is stipulated that the fair market value of the property on December 15, 1982, was $450,000.

At no time did MMR or the plan file Form 5330 with the IRS, reporting the sale and lease as prohibited transactions. The plan filed Form 5500-C, the Annual Report of Employee Benefit Plan, for 1977 through 1980 and 1982, and Form 5500-R, the Registration Statement of Employee Benefit Plan, for 1981. While the returns filed until 1981 refer to the bonus plan as the plan sponsor, all such returns after 1976 were actually filed by the ESOP.

On October 1, 1975, petitioner Hulan Rutland resigned as a director and vice president of MMR and terminated his employment with the company. After he left MMR, he gradually began to sell his stock in the company. After October 6, 1976, he owned no stock in MMR. At no time did Mr. Rutland own 10 percent or more of MMR stock. He was never a member of the plan's administrative committee.

On January 15, 1977, Mr. Woodard resigned as vice president and director of MMR and as a member of the administrative committee of the plan. He also terminated his employment with the company at such time. On December 30, 1976, Mr. Woodard owned less than 10 percent of the outstanding stock of MMR, and he sold his stock upon leaving the company.

On May 9, 1977, Mr. Matthews resigned as vice president and director of MMR and as a member of the administrative committee of the bonus plan. He also terminated his employment with MMR at such time. On December 30, 1976,

Mr. Matthews owned less than 10 percent of the outstanding stock of MMR, and he sold his stock prior to leaving the company.

In October 1984, the Commissioner sent each individual petitioner a notice of deficiency, in which he determined that each had participated in three prohibited transactions. He determined that the first such transaction involved the sale of the property to the plan. The second prohibited transaction involved the outstanding mortgage on the property assumed by the plan. The third prohibited transaction involved the issuance of the promissory note to the individual petitioners by the plan. The Commissioner determined that the individual petitioners were liable for excise taxes under section 4975(a) for each such prohibited transaction.

The Commissioner also sent a notice of deficiency to MMR, in which he determined that the lease of the property to MMR by the plan was a prohibited transaction. In such notice, the Commissioner determined that MMR was liable for excise taxes under section 4975(a) for such prohibited transaction.

OPINION

Section 4975, as added to the Internal Revenue Code by title II of ERISA,[4] imposes two levels of excise tax on a disqualified person who participates in a prohibited transaction. Section 4975(a) provides for a mandatory initial tax equal to 5 percent of the amount involved with respect to the prohibited transaction. Section 4975(b) imposes an additional tax equal to 100 percent of the amount involved, if the prohibited transaction is not timely corrected.

The first issue for our decision is whether the petitioners were disqualified persons within the meaning of section 4975(e)(2).[5] Such paragraph provides that the term "dis-

---

[4]Title I of ERISA (the labor title) sets forth guidelines and standards governing the establishment and operation of pension plans and also establishes general standards of conduct for plan fiduciaries. See generally ERISA sec. 2 et seq. The Department of Labor is given principal authority to administer and enforce the provisions of title I. See ERISA sec. 501 et seq. Title II of ERISA (the tax title) specifically amends the Internal Revenue Code of 1954. See ERISA sec. 1001 et seq.

[5]The prohibited transaction restrictions in the labor title of ERISA affect "parties in interest," while such restrictions in the tax title affect "disqualified persons." The two terms

qualified person" includes any person who is "an employer any of whose employees are covered by the plan" (sec. 4975(e)(2)(C)) and "an officer, director * * * , [or] a 10 percent or more shareholder" of such employer (sec. 4975(e)(2)(H)). The Commissioner determined that the individual petitioners were disqualified persons under section 4975(e)(2)(H) and that MMR was a disqualified person under section 4975(e)(2)(C). The Commissioner concedes on brief, for the first time, that petitioner Hulan Rutland was not a disqualified person and therefore no longer asserts a deficiency in excise tax with respect to him. The other petitioners bear the burden of proving the Commissioner's determinations to be erroneous. Rule 142(a), Tax Court Rules of Practice and Procedure;[6] *Welch v. Helvering,* 290 U.S. 111 (1933).

The remaining petitioners admit that Mr. McCracken, James Rutland, and MMR were disqualified persons. They also concede that Mr. Woodard and Mr. Matthews were disqualified persons at the time the transactions with the plan occurred. However, the petitioners argue that since such individuals severed their ties to MMR and to the plan in 1977, they are not liable for excise taxes accruing after such time.

The Commissioner argues that once a disqualified person enters into a prohibited transaction, he remains liable for any excise taxes until correction of the prohibited transaction is completed. The Commissioner cites as authority *M & R Investment Co. v. Fitzsimmons,* 484 F. Supp. 1041 (D. Nev. 1980), affd. 685 F.2d 283 (9th Cir. 1982). In that case, the court declined to enforce a loan commitment made by a pension fund to a hotel operator, where the parent corporation of the hotel operator also owned a transportation company whose employees were covered by the pension fund. Although the parent sold the transportation company before the loan funds were disbursed, the court held that the hotel operator constituted a "party-in-interest" under the labor title of ERISA. The court stated that it would "not construe ERISA to allow a party in interest to obtain a

are substantially the same in most respects, but the term "parties in interest" includes a broader range of persons. See H. Rept. 93-1280 (Conf.) (1974), 1974-3 C.B. 415, 468.

[6]Any reference to a Rule is to the Tax Court Rules of Practice and Procedure.

benefit or a loan otherwise prohibited under the Act as long as the party in interest subsequently purges, or agrees to purge, the taint or the prohibited transaction link." *M & R Investment Co. v. Fitzsimmons,* 484 F. Supp. at 1057. It further held that "It is the status and legal relationships of the borrower at * * * [the time the loan commitment was made] that trigger the application of the statute. The borrower's status and legal relationship at that time are frozen." *M & R Investment Co. v. Fitzsimmons,* 484 F. Supp. at 1058. We agree with the holding of the court in *M & R Investment Co.* In our view, the purpose of ERISA would not be served by allowing an otherwise disqualified person to avoid liability by merely changing his legal status after he has engaged in the prohibited transaction. We believe that a disqualified person can avoid further liability only by correcting the transaction in the manner prescribed in section 4975(f)(5). Since Mr. Matthews and Mr. Woodard failed to do so, we hold that all the remaining petitioners are disqualified persons under section 4975(e)(2).

The next issue for our decision is whether the sale of the property by the individual petitioners to the plan, and the subsequent lease of such property by the plan to MMR, constitute prohibited transactions under section 4975(c). In his notice of deficiency, the Commissioner determined that the individual petitioners engaged in three separate prohibited transactions—the sale of the property to the plan, the assumption of the outstanding mortgage by the plan, and the issuance of the promissory note to such petitioners by the plan. In a separate notice, the Commissioner also determined that the lease of the property by the plan to MMR constituted a prohibited transaction. The Commissioner conceded on brief that the assumption of the mortgage by the plan was not a prohibited transaction. As to the other transactions, the petitioners bear the burden of proving the Commissioner's determinations to be erroneous. Rule 142(a); *Welch v. Helvering, supra.*

Section 4975(c)(1) defines a prohibited transaction to include any direct or indirect—

(A) sale or exchange, or leasing, of any property between a plan and a disqualified person; [or]

(B) lending of money or other extension of credit between a plan and a disqualified person * * *

The petitioners first argue that they should not be subjected to the excise tax under section 4975 for equitable reasons. They claim that they acted in good faith and on the advice of their attorneys and investment counselors in engaging in the prohibited transactions. They further contend that the plan was not harmed and, in fact, was left better off as a result of the transactions.

In our view, such claims are not relevant in deciding whether the petitioners are liable for the excise taxes in issue. The language and legislative history of ERISA indicate a congressional intention to create, in section 4975(c)(1), a blanket prohibition against certain transactions, regardless of whether the transaction was entered into prudently or in good faith or whether the plan benefited as a result. "Good intentions and a pure heart are no defense" to liability under section 4975(a). *Leib v. Commissioner,* 88 T.C. 1474, 1481 (1987).

ERISA section 406, which is contained in the labor title and which parallels section 4975(c), defines prohibited transactions in which plan fiduciaries are not to engage. ERISA section 406 has been uniformly interpreted as imposing a per se prohibition of the transactions enumerated. See, e.g., *Donovan v. Cunningham,* 716 F.2d 1455, 1464-1465 (5th Cir. 1983); *M & R Investment Co. v. Fitzsimmons,* 685 F.2d 283, 287 (9th Cir. 1982); *Cutaiar v. Marshall,* 590 F.2d 523, 529 (3d Cir. 1979). As the Fifth Circuit in *Donovan v. Cunningham, supra,* stated:

The object of Section 406 was to make illegal per se the types of transaction that experience had shown to entail a high potential for abuse. * * * In the complex setting of employee benefit plans, brightline rules are advantageous to beneficiaries and fiduciaries alike, providing assured protection to the former and clear notice of responsibility to the latter. [716 F.2d at 1464-1465; citations omitted.]

Thus, we conclude that the fact that the petitioners may have acted in good faith with respect to the transactions in dispute offers no defense to the imposition of the excise tax under section 4975(a). *Leib v. Commissioner, supra.*

Two of the prohibited transactions challenged by the Commissioner arose from the same event—the purchase of

the property by the plan and the issuance of the promissory note by the plan to the individual petitioners as part payment for such purchase. The petitioners claim that to impose excise taxes on both transactions would subject them to double taxation. They argue that the issuance of the promissory note should be held not to be a prohibited transaction or, alternatively, that the amount involved in the sale transaction should be reduced by the amount of such promissory note.

In our view, each prohibited transaction enumerated in section 4975(c) was designed to guard against particular instances of over-reaching by a person able to exert influence over the affairs of such a plan. For example, section 4975(c)(1)(A), which prohibits sales of property between a plan and a disqualified person, discourages a disqualified person from charging the plan an excessive price for such property. Section 4975(c)(1)(B) prohibits a disqualified person from lending money or extending credit to a plan and thereby prevents such person from charging an excessive rate of interest or otherwise imposing unfavorable terms on such loan. We can find no indication in ERISA or in the legislative history that the prohibited transaction restrictions are intended to be mutually exclusive. Indeed, such a view is inconsistent with ERISA's objective of preserving plan assets. We observe that a person with close ties to a plan may be able to exact terms unfavorable to such plan both on a sale of property and on a loan to the plan made for the purpose of purchasing such property. We believe that Congress drafted ERISA to prohibit *both* such transactions to guard against such a possibility. While the transactions at issue may not contain unfavorable terms, the "per se" rules of ERISA do not relieve the petitioners of liability under section 4975(a). For such reason, we conclude that both the sale of the property to the plan, and the issuance of the promissory note by the plan, constituted prohibited transactions.

The sale of the property, the issuance of the promissory note to the individual petitioners, and the lease of the property by the plan to MMR all are prohibited transactions under section 4975(c) unless such transactions satisfy an exemption as specified in section 4975(d). The petitioners

argue that the transactions qualify for such an exemption under section 4975(d)(13). Such section provides that the prohibited transaction restrictions of section 4975(c) shall not apply to any transaction which is exempt from section 406 of ERISA by reason of the exemptions within section 408(e) of ERISA. Section 408(e) of ERISA provides that the prohibitions of section 406 of ERISA shall not apply to the acquisition, sale, or lease by a plan of qualifying employer real property as defined in section 407(d)(4) of ERISA. To be exempt, such acquisition, sale, or lease must be for adequate consideration, no commission must be charged for arranging such transaction, and the plan involved must be an eligible individual account plan as defined in section 407(d)(3) of ERISA. Sec. 408(e), ERISA. It is undisputed that those requirements have been satisfied, but it remains to be decided whether the property constituted qualifying employer real property within the meaning of section 407(d)(4) of ERISA.

The term "qualifying employer real property" means parcels of employer real property where, in addition to certain other requirements, a substantial number of the parcels are disbursed geographically and where each parcel of real property and the improvements on it are suitable, or adaptable without undue expense, for more than one use. Sec. 407(d)(4)(A) and (B), ERISA. The legislative history states that:

the plan might acquire and lease to the employer multipurpose buildings which are located in different geographical areas. It is intended that the geographical dispersion be sufficient so that adverse economic conditions peculiar to one area would not significantly affect the economic status of the plan as a whole. All of the qualifying real property may be leased to one lessee, which may be the employer or an affiliate of the employer. [H. Rept. 93-1280 (Conf.) (1974), 1974-2 C.B. 415, 479.]

In this case, the only real property owned by the plan was the complex which housed MMR's corporate office in Baton Rouge. Mr. McCracken testified at trial that the plan administrators intended to acquire additional parcels of land in Louisiana, but dropped the idea after learning of the problem with the transactions at issue. There is no other evidence in the record of any possible acquisitions. Even if we accept Mr. McCracken's testimony, the fact remains

that, throughout the years in issue, over 80 percent of the plan's total assets were invested in one parcel of land purchased from the individual petitioners. In our view, such a substantial, concentrated investment does not protect the assets of the plan from an economic downturn in the Baton Rouge area. For such reason, we conclude that the property does not constitute qualifying employer real property and that the transactions at issue do not qualify for an exemption under section 4975(d)(13) from the prohibited transaction restrictions of section 4975(c). See *Lambos v. Commissioner*, 88 T.C. 1440, 1451 (1987).

The next issue for our decision is whether the Commissioner's calculations of the excise tax deficiencies owed by the petitioners are proper. The deficiency attributable to a prohibited transaction is derived by multiplying the amount involved by 5 percent for each year or part of a year in the taxable period. Sec. 4975(a). For purposes of section 4975(a), the amount involved in a prohibited transaction means the greater of the amount of money and the fair market value of other property given, or the amount of money and the fair market value of other property received. Sec. 4975(f)(4). Such fair market value is determined as of the date on which the prohibited transaction occurs. Sec. 4975(f)(4)(A). The taxable period is defined to mean the period beginning with the date on which the prohibited transaction occurs and ending on the earliest of several dates, including the date on which correction of the prohibited transaction was completed. Sec. 4975(f)(2). A prohibited transaction is corrected by "undoing the transaction to the extent possible, but in any case, placing the plan in a financial position not worse than that in which it would be if the disqualified person were acting under the highest fiduciary standards." Sec. 4975(f)(5).

In challenging the Commissioner's calculations, the petitioners first contend that the prohibited transactions were corrected, and the taxable period closed, on June 4, 1980, when Mr. McCracken and James Rutland purchased the property from the plan for $430,000. They argue that the Commissioner was erroneous in determining that such transactions were not corrected until December 15, 1982,

when such individuals paid an additional $20,000 to the plan in consideration for such purchase.

The temporary regulations under section 4975 provide that, in the absence of permanent regulations for section 4975(f)(4) and (5), section 53.4941(e)-1 of the Foundation Excise Tax Regulations may be relied upon in interpreting terms appearing both in section 4941(e) and section 4975(f). See sec. 141.4975-13, Temporary Excise Tax Regs., 41 Fed. Reg. 32,890 (Aug. 6, 1976). See also *Leib v. Commissioner*, 88 T.C. 1474, 1482 (1987). The regulations under section 4941, which relate to self-dealings involving private foundations, are indeed instructive in deciding whether a prohibited transaction has been properly corrected. Section 53.4941(e)-1(c)(3), Foundation Excise Tax Regs., provides:

In the case of a sale of property to a private foundation by a disqualified person for cash, undoing the transaction includes, but is not limited to, requiring rescission of the sale where possible. However, in order to avoid placing the foundation in a position worse than that in which it would be if rescission were not required, the amount received from the disqualified person pursuant to the rescission shall be the greatest of the cash paid to the disqualified person, the fair market value of the property at the time of the original sale, or the fair market value of the property at the time of rescission. * * *

We have found as a fact that the fair market value of the property on December 15, 1982, was $450,000. However, the petitioners presented no evidence to show the fair market value of such property on June 4, 1980, the date which they claim closed the taxable period. Without evidence of such fair market value, we are unable to conclude that the prohibited transactions were properly corrected on such date. Thus, we hold that the sale to the plan was corrected on December 15, 1982, and that the taxable period ended on such date.

We must next consider the amounts involved in each prohibited transaction. The Commissioner determined that the amount involved in the sales transaction was $430,000. He also determined that the amount involved in each year at issue as a result of the loan by the individual petitioners to the plan was the value of the use of the original balance of the promissory note of $189,363.64. Further, he determined that the amount involved in each year at issue as a

result of the lease of the property to MMR was the amount of rent received by the plan each year.

The petitioners challenge such determinations only by arguing that since the sale of the property and the issuance of the promissory note by the plan arose from the same transaction, the amount involved in the sales transaction should be reduced by the amount of such loan. We have previously considered and rejected such argument. Both the sale and the loan constituted a separate prohibited transaction, and the amount involved in each transaction must be computed without regard to the other transaction. We find the amounts determined by the Commissioner to be reasonable and conclude that such determinations are proper.

The Commissioner calculated the excise tax arising from the issuance of the promissory note and the lease of the property to MMR by splitting such transactions into a number of separate prohibited transactions. He determined that one such prohibited transaction arose on the day such loan and lease were entered into, and continued until the taxable period ended. He further determined that a new prohibited transaction arose with respect to such loan and lease on the first day of each taxable year within the taxable period, and continued until the taxable period ended. The petitioners argue that the Commissioner's use of such "pyramiding" method to calculate the tax was erroneous.

This Court recently considered this issue in a case which presented almost identical facts to the case before us. See *Lambos v. Commissioner*, 88 T.C. 1440 (1987). In *Lambos,* the taxpayers controlled a corporation which maintained a profit-sharing plan for its employees. The taxpayers entered into leases with such plan. We held that such taxpayers were liable for excise taxes on one prohibited transaction entered into on the date the leases were executed, plus an additional prohibited transaction on the first day of each taxable year or portion of a taxable year until such transactions were corrected. 88 T.C. at 1452. We consider *Lambos* to control the resolution of the issue before us. For such reason, we conclude that the Commissioner's method of calculating the excise tax owed by the petitioners to be proper.

The next issue for our decision is whether the statute of limitations bars the Commissioner from assessing a portion of the excise taxes determined by him. As a general rule, any tax must be assessed by the Commissioner within 3 years of the due date of the return, or of the date on which the return is actually filed, if later. Sec. 6501(a). However, a 6-year statute of limitations applies if an excise tax return "omits an amount of such tax properly includible thereon which exceeds 25 percent of the amount of such tax reported thereon." Sec. 6501(e)(3). The regulations indicate that the failure to disclose a transaction on the return results in a 100-percent omission of the tax imposed with respect to such transaction. Sec. 301.6501(e)-1(c)(4), Proced. & Admin. Regs. On the other hand, the 6-year statute of limitations will not apply "if the transaction giving rise to such tax is disclosed in the return, or on a statement attached to the return, in a manner adequate to apprise the Secretary of the existence and nature of such item." Sec. 6501(e)(3). The parties agree that the Forms 5500 filed by the plan started the running of the statute of limitations with respect to transactions disclosed therein. The Commissioner argues that such returns did not adequately disclose the prohibited transactions and that therefore the 6-year statute of limitations applies.

Whether a return adequately discloses an item of income or a transaction is a question of fact. See *Quick Trust v. Commissioner*, 54 T.C. 1336, 1346 (1970), affd. per curiam 444 F.2d 90 (8th Cir. 1971). The Supreme Court has held, in considering the predecessor of section 6501(e), that the purpose of such section is to extend the limitations period when the Commissioner is peculiarly unable to detect errors because the taxpayer failed to report an item on the return. *Colony, Inc. v. Commissioner*, 357 U.S. 28 (1958). The Court stated that the extended statute of limitations applies when "the return on its face provides no clue as to the existence of the omitted item." 357 U.S. at 36.

In this case, the Commissioner contends that the prohibited transactions at issue were not adequately disclosed on the Forms 5500 filed by the plan. He points out that the question, "Did any transaction, involving plan assets, involve a person known to be a party-in-interest?" was

answered "No" on the Form 5500 filed for the 1977 plan year, the year in which the prohibited transactions occurred. He argues that such response served to hide the true nature of the transactions. The petitioners observe that the balance sheet of such return shows the acquisition of $430,000 in real estate and the assumption of $328,473 in indebtedness in such year. They argue that such amounts offered a "clue" to the Commissioner that the prohibited transactions occurred.

We are not persuaded by the petitioners' argument. In our view, the mere disclosure that the plan made a substantial investment in real estate, without identifying the parties to the transaction, is not sufficient to give notice to the Commissioner that a prohibited transaction occurred. ERISA allows a plan considerable freedom to make investments and the act's restrictions are applied only when such plan engages in a prohibited transaction with a disqualified person. In this case, the return filed by the plan provided no information that would lead the Commissioner to believe that an investment which, on its face, appeared to be permissible was, in fact, a prohibited transaction involving disqualified persons. For such reason, we hold that the Form 5500 filed by the plan for the 1977 year did not adequately disclose the nature of the transactions at issue. Therefore, the 6-year statute of limitations applies with respect to such transactions.

The petitioners next argue that, even if the 6-year statute of limitations applies to the Form 5500 filed by the plan, the application for exemption from the prohibited transaction restrictions filed in 1978 is sufficient to start the 3-year limitations period running.[7] The test to determine whether a document is sufficient for statute of limitations purposes has several elements: First, there must be sufficient information to enable the Commissioner to calculate the taxpayer's liabilities; second, the document must purport to be a return; third, there must be an honest and reasonable attempt to satisfy the requirements of the tax law; and fourth, the taxpayer must execute the document under

---

[7]It is undisputed that the application for exemption supplied the Commissioner with notice of the prohibited transactions. Such application was sent to both the Department of Labor, and the IRS, and was received by the Commissioner on Nov. 24, 1978.

penalties of perjury. *Beard v. Commissioner,* 82 T.C. 766, 777 (1984), affd. 793 F.2d 139 (6th Cir. 1986); see also *Florsheim Bros. Drygoods Co. v. United States,* 280 U.S. 453 (1930).

The petitioners cite cases in which courts held that a collateral source of information, other than the appropriate return, started the running of the statute of limitations. However, a close reading of such cases reveals that the information deemed sufficient to start the period running was reported on an improper return otherwise validly filed with the Commissioner. For example, *Germantown Trust Co. v. Commissioner,* 309 U.S. 304 (1940), a mutual fund operating in corporate form filed with the Commissioner a fiduciary income tax return which disclosed all the information necessary to the calculation of any tax due. The Court held that such fiduciary return was sufficient to start the running of the limitations period as to any corporate income taxes owed by the company. *Germantown Trust Co. v. Commissioner, supra* at 310; see also *Walker v. Commissioner,* 46 T.C. 630 (1966).

In this case, the petitioners failed to file a return which would have alerted the Commissioner that prohibited transactions had occurred. We recognize that the application for exemption did disclose many details of such transactions. However, it did not "purport to be a specific statement of the items of income, deductions, and credits in compliance with the statutory duty to report information and to have that effect it must honestly and reasonably be intended as such." *Florsheim Bros. Drygoods Co. v. United States,* 280 U.S. at 462. The document filed by the petitioners did not purport to be a return. Rather, its sole purpose was to argue for an exemption from ERISA's prohibited transaction restrictions. For such reason, the application cannot be deemed a return sufficient to start the 3-year statute of limitations running under section 6501(a).

The final issue for our decision is whether section 4975 is an excise tax provision or a penalty provision. The petitioners argue that such section is intended to discourage certain prohibited transactions by imposing a penalty on persons who engage in such transactions. For such reason, they claim that the accrual of interest on any deficiency resulting

from this case may be delayed under section 6601(e)(3). Such section provides that interest on any assessable penalty does not begin to accrue until the issuance of a notice and demand for payment of such penalty issued by the Commissioner.

The petitioners again draw a parallel between section 4975 and section 4941, which imposes an excise tax on transactions between a private foundation and a disqualified person. Courts have generally construed section 4941 as imposing a penalty for the purposes of computing interest. See, e.g., *Rockefeller v. United States*, 572 F. Supp. 9, 16 (E.D. Ark. 1982), affd. per curiam 718 F.2d 290 (8th Cir. 1983); *Farrell v. United States*, 484 F. Supp. 1097, 1099 (E.D. Ark. 1980). See also *In re Control Systems, Inc.*, 586 F.2d 1036, 1039 (5th Cir. 1978); *In re Kline*, 403 F. Supp. 974, 979 (D. Md. 1975), affd. per curiam 547 F.2d 823 (4th Cir. 1977).

This Court's jurisdiction is limited to redetermining the amount of a deficiency or addition to tax determined by the Commissioner. Sec. 6213. For such reason, we generally decline to consider issues relating to the accrual of interest on a deficiency. See, e.g., *LTV Corp. v. Commissioner*, 64 T.C. 589, 597 (1975); *Chapman v. Commissioner*, 14 T.C. 943, 946-947 (1950), affd. 191 F.2d 816 (9th Cir. 1951).[8] Our research has not revealed, nor have the petitioners brought to our attention, any case in which this Court has asserted jurisdiction to consider whether either section 4941 or section 4975 imposes a penalty. We observe that the characterization of section 4975 as a penalty provision would only affect the amount of interest owed by the petitioners. Such a holding would have no effect whatever on the amount of deficiency owed by them. For such reason, we conclude that we have no jurisdiction to determine whether section 4975 imposes an excise tax or a penalty for engaging in prohibited transactions.

---

[8]See also *Brunwasser v. Commissioner*, T.C. Memo. 1986-197, affd. 833 F.2d 303 (3d Cir. 1987); *Benson v. Commissioner*, T.C. Memo. 1985-615. We observe that, in general, where Congress has found it advisable for this Court to consider issues relating to interest, it has expressly granted us jurisdiction to do so. See, e.g., sec. 6621(c)(4), I.R.C. 1986 (relating to jurisdiction of this Court to determine increased rate of interest on substantial underpayments of tax attributable to tax-motivated transactions).

*Decision will be entered for the petitioner in docket No. 42535-84; decisions will be entered under Rule 155 in docket Nos. 42536-84, 42537-84, 42538-84, 42539-84, and 42540-84.*