# United States Tax Court

T.C. Memo. 2024-21

ACQIS TECHNOLOGY, INC. AND CONSOLIDATED SUBSIDIARY,
Petitioner

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

————————

Docket No. 9261-17.                    Filed February 13, 2024.

————————

*Nathan E. Honson*, *Theresa M. Bevilacqua*, and *Nicholas K. Tygesson*, for petitioner.

*Jeannine A. Zabrenski*, *Robert J. Braxton*, *Kathleen K. Raup*, and *Laurel B. Stout*, for respondent.

## MEMORANDUM FINDINGS OF FACT AND OPINION

MARSHALL, *Judge*: By statutory notice of deficiency dated February 1, 2017, the Internal Revenue Service (IRS or respondent) determined deficiencies in petitioner's federal income tax and penalties as follows:

**[*2]**

| TYE Nov. 30[1] | Deficiency | Penalty § 6662(a) |
|---|---|---|
| 2010 | $5,003,457 | $1,000,691 |
| 2011 | 2,960,097 | 592,019 |
| 2012 | 4,777,425 | 955,485 |
| 2015 | 235,301 | 47,060 |

Petitioner timely petitioned this court. After concessions, the issues before us are whether payments petitioner received upon settlement of certain patent infringement litigation are includible in gross income or are nontaxable contributions to capital, whether the six-year limitations period under section 6501 applies, and whether penalties under section 6662(a) apply.[2] As explained below, we resolve these issues in favor of respondent.

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The First Stipulation of Facts, the Second Stipulation of Facts, and the attached Exhibits are incorporated herein by this reference. Acqis Technology, Inc., is a Delaware corporation with its principal place of business in California. During all relevant times, Acqis Technology, Inc., was the parent corporation of ACQIS, LLC, a wholly owned subsidiary (collectively, petitioner or Acqis).

Petitioner was founded by Dr. William Chu (Chu) in 1998 and originally incorporated in California. The Acqis board of directors (BOD) was formed thereafter. The BOD controls the issuance of dividends and distributions and exercises other corporate powers. From 2004 through November 2010, the members of the BOD were Acqis's largest shareholders. From the point of incorporation, petitioner issued both common stock and preferred stock (Series A Preferred Stock and Series B Preferred Stock).

Acqis initially operated as a computer hardware developing and licensing business. In 2004 Acqis sold its hardware business and

---

[1] Petitioner's taxable yearend is November 30. The deficiency and penalty amounts stated for each year refer to amounts petitioner received from December 1 of the preceding year through November 30 of the stated year.

[2] Unless otherwise indicated, statutory references are to the Internal Revenue Code, Title 26 U.S.C. (Code), in effect at all relevant times, regulation references are to the *Code of Federal Regulations*, Title 26 (Treas. Reg.), in effect at all relevant times, and Rule references are to the Tax Court Rules of Practice and Procedure.

[*3] transitioned into a nonpracticing patent licensing entity. Acqis acquired seven U.S. patents related to modular computer systems and set about seeking royalties from entities that infringed on those patents. In April 2004 petitioner retained Townsend, Townsend & Crew, LLP (Townsend) to send "notice letters" to companies Acqis viewed as potentially infringing on its patents. Petitioner provided Townsend with a list of patents and potential royalty estimates, and Townsend began issuing notice letters in May 2004. In September 2004 petitioner retained Ronald Schultz, Esq., of Robins, Kaplan, Miller & Ciresi on a contingency fee basis to represent petitioner with respect to patent licensing and enforcement litigation.

From 2004 through 2009 petitioner strengthened its patent portfolio and prepared lawsuits against large technology companies selling blade server products. Petitioner continued seeking additional patents related to blade server technology and obtained three such patents between February and May 2008. Petitioner owned a total of eight blade server patents, issued to it between 2001 and 2008, at the time it began preparing for patent infringement lawsuits.

In September 2008 petitioner engaged Cooley Godward Kronish, LLP (Cooley), to enforce its patents on a full contingency fee basis. Cooley's fee to license and enforce the blade server patents was equal to 33-1/3% to 45% of net revenues (i.e. gross revenues less Cooley's expenses) generated from patent infringement enforcement, subsequent licensing transactions, or court awards. Cooley was not entitled to a contingency fee from amounts paid by persons purchasing petitioner's stock.

Cooley and Acqis spent September 2008 through April 2009 preparing to enforce Acqis's patent portfolio through litigation. As of the filing of the Petition, all companies that have entered into licensing agreements with petitioner were first sued by petitioner for patent infringement.

I.    *Acqis's Share Structure*

Petitioner began issuing common stock and Series A Preferred Stock upon its incorporation in 1998 and began issuing Series B Preferred Stock in 2000 (the three classes of stock are hereafter collectively, Investment Shares). Between July 13, 1998, and December 24, 2009, petitioner issued common stock shares at the price of $0.06 or $0.10 per share by way of sales, stock option exercises, or warrant

[*4] exercises. Between October 31, 2000, and July 15, 2010, petitioner sold Series B Preferred Stock at the price of $1.00 per share. Shareholders of the Investment Shares (Investment Shareholders) are Chu's family, friends, business associates, and angel investors. When soliciting investment in Investment Shares, petitioner provided potential investors with confidential information regarding its finances, patent portfolio, targeted companies and projected returns. Petitioner never distributed proceeds from the sales of Investment Shares to existing shareholders as a dividend or distribution. Petitioner hired a law firm on an hourly basis to assist with the sale of Investment Shares, and upon purchase, Investment Shareholders would send funds directly to petitioner.

As of November 17, 2010, petitioner had issued and authorized the following shares and classes of stock:

| Type of Stock | Shares Issued | Shares Authorized |
|---|---|---|
| Common Stock | 8,326,550 | 18,000,000 |
| Series A Preferred | 1,900,005 | 2,000,000 |
| Series B Preferred | 4,616,675 | 5,500,000 |

On November 18, 2010, the BOD authorized, and petitioner created a new class of stock, Class B Common Stock (Settlement Shares), while the existing common stock was converted to Class A Common Stock. On January 19, 2011, Acqis converted the Series A Preferred shares and the Series B Preferred shares into Class A Common Stock.

On December 16, 2011, Acqis reincorporated in Delaware. In a letter to investors petitioner explained the reincorporation as allowing greater flexibility in declaring dividends and establishing liquidation preference among the different classes of stock. The reincorporation also facilitated the creation of Class C Common Stock, which petitioner anticipated it might issue in connection with future litigation. As of the time of trial, however, petitioner had not yet issued any shares of Class C Common Stock.

As part of the reincorporation in Delaware, Acqis made changes to dividend and distribution rights, liquidation preference, and voting rights held by the different classes of stock. Following the reincorporation, the BOD may prefer Investment Shareholders over Class B Common Stock shareholders (Settlement Shareholders) and any potential Class C Common Stock shareholders with respect to the issuance of dividends or distributions, permitting the payment of a dividend to Investment Shareholders but not to Settlement

[*5] Shareholders or Class C Common Stock shareholders. With respect to liquidation rights preferences among the share classes, Settlement Shares were not entitled to receive any payment upon liquidation until Investment Shares had first been paid ratably out of the legally distributable assets of the company an amount equal to any proceeds received by, or capital contributions to, petitioner in respect of the First Patent Litigation (defined below), including any settlements or judgments related to it. As of November 30, 2012, petitioner reported current assets of $5,745,200. With respect to voting and BOD election and removal rights, Investment Shares were entitled to one vote per share, whereas Settlement Shares and Class C Common Stock were nonvoting.

## II.    *First Patent Litigation*

On April 2, 2009, petitioner filed a single lawsuit (First Patent Litigation) against 11 companies: Defendant 1 (D1), a corporation subsequently acquired by Defendant 2 (D2), Defendant 3 (D3), Defendant 4 (D4), Defendant 5 (D5), Defendant 6 (D6), Defendant 7 (D7), Defendant 8 (D8), Defendant 9 (D9), Defendant 10 (D10), and Defendant 11 (D11) (collectively, First Patent Litigation Defendants).[3] Cooley, as counsel for Acqis for the First Patent Litigation, hired experts to assist with valuation and expert testimony, and opened trust accounts to receive settlement payments (collectively, Lawyer Trust Account).

Acqis and Cooley succeeded in pursuing patent infringement damages and licensing fees from each of the First Patent Litigation Defendants in the form of negotiated settlements. The First Patent Litigation Defendants each paid cash amounts to the Lawyer Trust Account.[4] Cooley's contingent legal fee due from petitioner for settlement of the First Patent Litigation was based on the amounts paid into the Lawyer Trust Account.

---

[3] The identity of and amount paid by any patent litigation defendant will not be disclosed pursuant to the Court's Orders dated April 16 and May 4, 2021.

[4] The settlement amounts paid by each of the remaining First Patent Litigation Defendants to petitioner were each less than the settlement amounts that D1, D2, D3, and D4 ultimately agreed to pay petitioner.

**[\*6]** III.　　*Settlements with D1, D2, D3, and D4*

    A.　　*Negotiations and Settlement with D1*

Petitioner demanded damages exceeding the amount ultimately paid by D1 ($D1); the amount initially demanded for patent infringement was determined by experts hired by Cooley. Petitioner and D1 engaged in mediation in connection with the First Patent Litigation in November 2010. As part of these settlement negotiations, petitioner requested that D1 become a shareholder of petitioner by purchasing shares in petitioner, in exchange for a reduced settlement amount. D1 had never previously sought to become a shareholder of petitioner but agreed to the settlement structure to save money. Petitioner did not provide future patent enforcement plans or financial information, other than relevant incorporation documents, as part of the share purchase proposal.

Acqis and D1 reached a settlement on November 3, 2010, and signed a memorandum of understanding (MOU), a settlement and patent license agreement (SA), and a share purchase agreement (SPA). The parties agreed that, contingent upon the payment of $D1 to Acqis, Acqis and D1 would dismiss all pending litigation against each other, and D1 would purchase Settlement Shares at $Z per share and a license to use Acqis's patents. Chu chose the $Z share price based on his estimate of Acqis's portfolio success in four or five years, but he did not have the shares valued. The SA required D1 to cease any assistance to remaining parties to the First Patent Litigation and granted D1 a perpetual license to use any current or future intellectual property (IP) held by Acqis at no additional expense beyond $D1. D1 deposited $D1 in the Lawyer Trust Account on November 24, 2010. Cooley received its contingent legal fee calculated on the full payment amount made by D1 in accordance with Cooley's agreement with Acqis for settlements resulting from the First Patent Litigation. D1 would have paid the settlement amount with or without the SPA.

    B.　　*Negotiations and Settlement with D2*

Petitioner also demanded damages exceeding the amount ultimately paid by D2 ($D2); the amount initially demanded for patent infringement was determined by experts hired by Cooley. Petitioner and D2 engaged in mediation in connection with the First Patent Litigation in December 2010. As part of these settlement negotiations, petitioner requested that D2 become a shareholder of petitioner by purchasing

[*7] shares in petitioner in exchange for a reduced settlement amount. Petitioner did not provide future patent enforcement plans or financial information, other than relevant incorporation documents, as part of the share purchase proposal. Neither Acqis nor D2 engaged in discussions regarding the per-share price of Acqis shares. They instead negotiated only the overall settlement amount to be paid.

Acqis and D2 reached a settlement on December 30, 2010, and signed an MOU, an SA, and an SPA. The parties agreed that, contingent upon the payment of \$D2 to Acqis, Acqis and D2 would dismiss all pending litigation against each other, D2 would cease any assistance to remaining First Patent Litigation Defendants, and D2 would receive Settlement Shares at \$Z per share and a license to use Acqis's patents. Chu again chose the \$Z share price based on his estimate of Acqis's portfolio success in four or five years, but he did not have the shares valued. D2 designated Susan G. Komen for the Cure® (Komen) as the recipient of the Settlement Shares; D2 never possessed any Acqis shares. As of the filing of the Petition, petitioner has never provided Komen with any financial information.

The SA granted D2 a perpetual license to use any current or future IP held by Acqis at no additional expense beyond \$D2, despite D2 never becoming a shareholder of Acqis. D2 deposited \$D2 in the Lawyer Trust Account on or about December 30, 2010. Cooley received its contingent legal fee calculated on the full payment amount made by D2 in accordance with Cooley's agreement with Acqis for settlements resulting from the First Patent Litigation. D2 had never previously sought to become a shareholder of Acqis, and its primary reason for agreeing to the SPA was to settle the litigation and obtain a license.

C.    *Negotiations and Settlement with D3*

Petitioner also demanded damages exceeding the amount ultimately paid by D3 (\$D3); the amount initially demanded for patent infringement was determined by experts hired by Cooley. Petitioner and D3 engaged in mediation in connection with the First Patent Litigation, during which petitioner requested that D3 become a shareholder of petitioner by purchasing shares in petitioner in exchange for a reduced settlement amount. Petitioner did not provide future patent enforcement plans or financial information, other than relevant incorporation documents, as part of the share purchase proposal. Neither Acqis nor D3 engaged in discussions regarding the per-share

[*8] price of Acqis shares. They instead negotiated only the overall settlement amount to be paid.

Acqis and D3 reached a settlement on December 23, 2011, and signed an MOU, an SA, and an SPA. The parties agreed that, contingent upon the payment of $D3 to Acqis, Acqis and D3 would dismiss all pending litigation against each other and D3 would receive Settlement Shares at $Z per share and a license to use Acqis's patents.[5] Chu again chose the $Z share price despite the fact that a year had passed since the settlements with D1 and D2. The $Z share price was again purportedly based on Chu's estimation of Acqis's portfolio success in four or five years, and again he did not have the shares valued. Like D2, D3 designated Komen as the recipient of the Settlement Shares; D3 never possessed any Acqis shares. As of the filing of the petition, petitioner has never provided Komen with any financial information.

The SA granted D3 a perpetual license to use any current or future IP held by Acqis at no additional expense beyond $D3, despite D3 never becoming a shareholder of Acqis. D3 deposited $D3 in the Lawyer Trust Account on or about December 23, 2011. Cooley received its contingent legal fee calculated on the full payment amount made by D3 in accordance with Cooley's agreement with Acqis for settlements resulting from the First Patent Litigation. D3 had never previously sought to become a shareholder of Acqis, and its primary reason for agreeing to the SPA was to settle the litigation and obtain a license.

D. *Negotiations and Settlement with D4*

Petitioner demanded from D4 damages exceeding the amount ultimately paid by D4 ($D4). Petitioner and D4 engaged in negotiations in connection with the First Patent Litigation, during which petitioner requested that D4 become a shareholder of petitioner by purchasing shares in petitioner. D4 had never previously sought to become a shareholder of Acqis. D4 ultimately paid a higher settlement amount to Acqis because it declined to structure the settlement as a share purchase.

Acqis and D4 reached a settlement on December 2, 2010, agreeing that D4 would pay Acqis an amount less than $D4 ($D4Z) in exchange for Acqis and D4 dismissing all pending litigation against each other and Acqis granting D4 a perpetual license to use any current or future

---

[5] The MOU mistakenly listed an incorrect price per share of $Y.

**[\*9]** IP held by Acqis. D4 deposited \$D4Z in the Lawyer Trust Account on December 17, 2010. Cooley received its contingent legal fee calculated on the full payment amount made by D4 in accordance with Cooley's agreement with Acqis for settlements resulting from the First Patent Litigation.

E. *Rights of First Refusal*

Investment Shareholders had a right of first refusal to protect their investment from dilution if petitioner sold additional shares. Nevertheless, Acqis never offered any Investment Shareholders the opportunity to purchase Settlement Shares alongside D1, D2, or D3. Chu opined that Investment Shareholders were not interested in Settlement Shares because Investment Shareholders had "better shares."

F. *Settlement Terms*

By December 31, 2011, all activities related to the First Patent Litigation had concluded, and all First Patent Litigation defendants had settled with Acqis. Ultimately, the primary difference in the agreements signed by D1, D2, and D3 and the other First Patent Litigation Defendants was the inclusion of SPAs.[6] None of the agreements executed by D1, D2, and D3 in connection with the First Patent Litigation allocated the settlement payment amounts to taxable gross income or to nontaxable stock purchases. Instead, the SAs provide that each party must determine and be responsible for its tax treatment of the transaction. D2 and D3 treated the settlement payments as made for licenses and claimed business deductions for the payments.[7] D2 and D3 did not treat the payments as made for investments and did not claim a charitable contribution deduction for their assignment of Acqis shares to Komen.

In seeking settlements with D1, D2, D3, and D4, petitioner offered discounted settlement amounts for structuring settlements to

---

[6] As part of the settlements, D1, D2, D3, D4, D8, and D11 received a perpetual license to use petitioner's existing and future patents. D5, D7, and D9 received a perpetual license to use petitioner's existing and future patents related to the underlying patents in the First Patent Litigation. D10 received a perpetual license to use petitioner's existing patents related to the underlying patents in the First Patent Litigation. Finally, D6 did not receive a license to use any of petitioner's patents.

[7] As of the time of trial D1 no longer had any record of its treatment of the settlement payment.

[*10] include SPAs, such that D1, D2, D3, and D4 would each pay less to receive a settlement, shares, and a license than they would pay for just a settlement and a license. D1, D2, D3, and D4, were the only First Patent Litigation Defendants to receive SPA offers, and ultimately they were the defendants that paid the most into the Lawyer Trust Account. Chu testified that he proposed the idea to change the dynamic of the lawsuits and Acqis accepted less money in settlement because having large technology companies as shareholders would validate Acqis, granting it credibility. Although Chu testified that Acqis settled with D2 and D3 at discounted rates on account of the credibility Chu expected D2 and D3 could grant to Acqis as shareholders, D2 and D3 never became shareholders, having designated Komen as the recipient of the Settlement Shares. Furthermore, the SPAs precluded Acqis from disclosing the identities of D1, D2, and D3.[8]

D1, D2, and D3 essentially obtained "free licenses" because they became shareholders. When discussing the license component of the settlement with D1, Chu stated:

> In the business deal, in the business transaction that we did, by inviting them to become a major owner in this case, of our patent, I certainly felt that for that – for being a major shareholder of our patent, I would not ask them for a license fee, which is a business call . . . . For them, it's a free license. And if we can recoup the number or the price of what they pay for or the amount that they pay for, then they got it for free. So to me, it's a free license.

D2 and D3 received "free licenses" but, as stated, never became shareholders of Acqis. D1 is the only Acqis shareholder who has been granted a license, free or otherwise.

At the time of the First Patent Litigation, Chu was aware that, by structuring the settlement payments as stock sales, petitioner would report the transactions as capital contributions and therefore no taxable income. Chu stated that structuring smaller settlement amounts as SPAs was not worth the legal cost associated with the process, despite having a stated goal of enlisting large technology companies as

---

[8] On one occasion in 2018 petitioner disclosed the identity of D1 as a shareholder without being granted permission by D1.

[*11] shareholders with value coming from the size of the company, not the size of the investment.

## IV. *Second and Third Patent Litigation*

In September 2013 petitioner filed four patent infringement lawsuits (Second Patent Litigation) against Defendant 12 (D12), Defendant 13 (D13), Defendant 14 (D14), and Defendant 15 (D15) (collectively, Second Patent Litigation Defendants). Cooley again represented petitioner for the Second Patent Litigation on a contingent fee basis under the same terms as for the First Patent Litigation. The Second Patent Litigation involved blade server and serial peripheral component interconnect (PCI) patents. Petitioner alleged infringement of 11 patents that were issued to petitioner between 2005 and 2009. Petitioner demanded damages from each of the Second Patent Litigation Defendants and entered into SAs in December 2014, January 2015, and September 2015. The settlement amounts paid by D12, D14, and D15 to petitioner were each substantially smaller than the settlement amount that D1, D2, or D3 agreed to pay petitioner. Petitioner did not offer any of these large technology companies in the Second Patent Litigation the opportunity to structure their settlements to include SPAs because the settlement amounts were "very small" and it would not be "worth the legal cost to go through that process." The Second Patent Litigation Defendants wired their settlement payments to the Lawyer Trust Account. Cooley received its contingent legal fee calculated on the full payments made by the Second Patent Litigation Defendants. Petitioner exhausted its ability to obtain licensing fees from the blade server market upon settlement of the Second Patent Litigation.

Petitioner's litigation against D13 was still pending and had not yet been concluded as of the filing of the Petition in this case. D13, in performing discovery in their case with Acqis, moved to compel production of documents relating to petitioner's valuation of the license given to D3. D13's counsel argued that D13 was entitled to statements petitioner made regarding the valuation of the D1, D2, and D3 settlement amounts, especially to the extent that petitioner argued that the licenses had no value. Petitioner's counsel, Cooley, argued that disclosure to D13 of petitioner's valuations of the "free licenses," per Chu's words, was inappropriate because "[t]hese are valuations [and] allocations that are made for different purposes under California tax law, under federal tax law, and not economic analysis."

[*12] In September and October 2020 petitioner filed patent infringement lawsuits (Third Patent Litigation) against Defendant 16, Defendant 17, Defendant 18, Defendant 19, Defendant 20, and Defendant 21. The Third Patent Litigation involved products using serial PCI and Universal Serial Bus 3.0 that allegedly infringed upon patents issued to petitioner between 2015 and 2018. Chu testified that, at the time of the settlements with D1, D2, and D3, Acqis had not yet applied for the patents pursuant to which Acqis initiated the Third Patent Litigation, and they were only in Chu's head. All Third Patent Litigation cases were still pending at the time of trial.

V.    *Financial and Tax Reporting*

Petitioner's taxable yearend is November 30. From 1998 through 2009, petitioner did not earn a profit. For each of the taxable years during the First Patent Litigation, petitioner submitted into evidence profit and loss statements reporting settlement income for each year from 2008 to 2012.[9]

Petitioner filed its Forms 1120, U.S. Corporation Income Tax Return, for tax years ending November 30, 2010 (2009 Form 1120), November 30, 2011 (2010 Form 1120), November 30, 2012 (2011 Form 1120), and November 30, 2015 (2014 Form 1120), on February 15, 2011, February 15, 2012, August 14, 2013, and February 15, 2016, respectively. On its 2009 Form 1120 petitioner listed its business activity as "Sales & Development" and its product or service as "Computer." On its 2010 and 2011 Forms 1120 petitioner listed its business activity as "Patent" and its product or service as "Royalties."

Petitioner did not report payments from D1, D2, and D3 as gross receipts on the 2009, 2010, or 2011 Form 1120. Petitioner instead reported increases in shareholder equity in common stock on line 22b of Schedule L, Balance Sheet per Books, of each Form 1120. The increases to shareholder equity for each year roughly corresponded to, but did not match, the settlement amounts received from D1, D2, and D3. On the Forms 1120 petitioner reported as "Cost of Goods Sold" the contingent legal fee amounts paid to Cooley in connection with the First Patent

---

[9] Despite receiving settlement amounts for each of 2008 through 2012, petitioner's profit and loss statements for these years showed losses for 2008, 2009, 2010, and 2012.

**[\*13]** Litigation settlements, describing the amounts as "legal settlement fees" in a statement attached to each return.

On the 2009 Form 1120 petitioner reported $W in gross receipts from the First Patent Litigation settlement payments[10] from D5, D6, D7, D9, D10, and D11. *See supra* note 3. On the 2010 Form 1120 petitioner reported $V as gross receipts from the First Patent Litigation settlement payments from D4, D5, and D11. On the 2011 Form 1120 petitioner reported $U in gross receipts from the First Patent Litigation but reported $T of royalty income from D5 and D9.

Gary Price of the accounting firm Sensiba San Filippo, LLP (Sensiba), prepared and signed the 2009, 2010, 2011, and 2014 Forms 1120. Petitioner informed Sensiba that D1, D2, and D3 had each paid petitioner to purchase Settlement Shares and that in the cases of D2 and D3, the shares were being issued to Komen. Petitioner did not provide Sensiba with copies of the SAs or the SPAs with respect to D1, D2, or D3. Petitioner did not provide Sensiba a copy of the fee agreement with Cooley, which sets forth that the contingent legal fees are calculated on net revenues generated from enforcement for licenses or recoveries owed to petitioner pursuant to licensing transactions. Neither Sensiba nor Cooley provided petitioner with opinions regarding the proper tax treatment of the payments by D1, D2, and D3 in settlement of the First Patent Litigation. Chu reviewed and approved the 2009, 2010, 2011, and 2014 Forms 1120.

On February 1, 2017, the IRS issued a notice of deficiency (Notice) with respect to petitioner's tax years ending November 30, 2010, 2011, 2012, and 2015. The Notice determined that the payments from D1, D2, and D3 are not contributions to capital but rather are includible in income as gross receipts, resulting in deficiencies for taxable years ending November 30, 2010, 2011, and 2012. The adjustments to taxable years ending November 30, 2010, 2011, and 2012 resulted in computational adjustments to petitioner's net operating loss (NOL) carryovers and carrybacks, resulting in a deficiency for the taxable year ending November 30, 2015. The Notice also determined a penalty under section 6662(a) for each taxable year.

---

[10] We note that D8 entered into an SA with petitioner on October 2, 2009, and made a settlement payment to petitioner on October 14, 2009. Because petitioner's tax yearend is November 30, D8's settlement payment would have been reported on petitioner's 2008 Form 1120.

**[\*14]** VI.    *Acqis's Shareholder Relations*

Petitioner reserved funds received from the settlement payments by D1, D2, D3, and D4 for distributions to Investment Shareholders. Chu testified that the payments from D1, D2, and D3 allowed Acqis to continue the business and "reward" Investment Shareholders.

As of the time of trial, D1 and Komen owned 13% of petitioner but continued to lack voting rights or BOD representation.   They had minimal interaction with petitioner since the First Patent Litigation settlements.  D1 and Komen, the third- and second-largest shareholders, respectively, never regularly received financial reporting information from Acqis.  D1 and Komen were required to hold the Settlement Shares indefinitely unless petitioner registered its shares under the Securities Act of 1933.   In 2010 and 2011 Komen sought to sell or liquidate the Settlement Shares it held, but petitioner denied the request, stating that it permitted no sales or transfers of Acqis shares among shareholders.

As of May 2, 2013, the BOD consisted solely of shareholders directly or indirectly owning shares of Class A Common Stock.  From 2004 through 2022, the members of the BOD did not change except for the retirement of one member.    Petitioner has never made any distribution or paid any dividends to Settlement Shareholders.

VII.    *Expert Testimony on Fair Market Value*

Both petitioner and respondent presented expert testimony with respect to the fair market value (FMV) of the Settlement Shares and license agreements at the time D1, D2, and D3 reached settlements with petitioner.  There is no dispute about the qualifications of the experts.

Michael Pellegrino (Pellegrino) testified as an expert in IP valuation on behalf of petitioner.   Pellegrino approached the stock valuation by first determining a value for Acqis's patent portfolio and then allocating that value across the outstanding shares.  Ultimately, Pellegrino determined that Acqis's patent portfolio had a value between $175,666,458 and $462,209,323, with a median value of $318,851,038. By dividing the $318,851,038 value equally across the 17,322,729 total outstanding common stock shares and options, Pellegrino arrived at a Settlement Share price of $18.40 per share.  Pellegrino's model valued Class A Common Stock and Settlement Shares equally, ascribing no economic   impact   to   voting   rights,   distribution   rights,   BOD representation, or liquidation preference.

**[\*15]** Pellegrino determined the Acqis patent portfolio valuation using the patents Acqis owned and projected incomes from each as asserted by Acqis representatives. In his model Pellegrino included 34 patents in Acqis's patent portfolio. As of November 3, 2010, the date that Acqis and D1 reached an SA, petitioner had been granted approval for 18 of those patents, had 5 patents pending approval, and had yet to apply for 11 of the patents. Pellegrino had met with Chu and other Acqis representatives in 2015 to gather additional information on Acqis. At those meetings Chu and the other Acqis representatives provided Pellegrino with market sizes for products potentially infringing on Acqis's patent portfolio, Acqis's expected royalty rates for various products, and an assumed royalty base of 100%.[11] With that information gathered in 2015, Pellegrino then created a valuation model.

Jeff Anderson (Anderson) testified as an expert in IP valuation and business valuation on behalf of respondent. Anderson approached the stock valuation by determining what value, if any, the Settlement Shareholders could derive from owning the Settlement Shares. Ultimately, Anderson determined that the shares have no value. Alternatively, Anderson determined a range of values between $0.032 and $0.146 per share based on Acqis's historical results, drawing on prior income and expenses.

Anderson determined Acqis's enterprise value using Acqis's projected income using a discounted cashflow analysis based on the net present values of the cashflows from the licenses. Anderson then applied discounts to the value for lack of marketability to account for the Settlement Shareholders' inability to sell or transfer shares and their lack of voting rights, and petitioner's lack of economic motivation to pay dividends or distributions and the Settlement Shareholders' inability to force such a change. Anderson determined that the Settlement Shares

---

[11] "A reasonable royalty is calculated by identifying a royalty 'base' (*i.e.*, the amount of infringing sales against which damages are assessed) and applying a royalty 'rate' to that base (*i.e.*, a percentage to which a willing licensor and willing licensee would have agreed in a hypothetical negotiation before infringement began, reflecting the proportional value of the patented technology to the base)." *MediaTek, Inc. v. Freescale Semiconductor, Inc.*, 2014 WL 2854890, at \*2 (N.D. Cal. June 20, 2014) (citing *VirnetX Inc. v. Apple Inc.*, 925 F. Supp. 2d 816, 835 (E.D. Tex. 2013), *aff'd in part, rev'd in part, vacated in part, and remanded sub nom. VirtnetX, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308 (Fed. Cir. 2014)). In other words, the royalty base is the revenue pool that was implicated by the infringement. "The royalty base generally is determined based upon the 'smallest salable patent-practicing unit.'" *Id.* (quoting *LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 67 (Fed. Cir. 2012)).

**[\*16]** could not generate income for the Settlement Shareholders and likewise precluded them from modifying the rights of their shares to generate income in the future, depriving the shares of any value.

## OPINION

I.    *The SPAs Were Shams.*

Taxpayers generally bear the burden of proof in this Court. Rule 142(a)(1). The Commissioner's determination that a transaction is a sham is generally presumptively correct. *Sochin v. Commissioner*, 843 F.2d 351, 355 n.9 (9th Cir. 1988), *aff'g Brown v. Commissioner*, 85 T.C. 968 (1985), *abrogated on other grounds by Landreth v. Commissioner*, 859 F.2d 643 (9th Cir. 1988); *see also Welch v. Helvering*, 290 U.S. 111, 115 (1933). The taxpayer has the burden of proof to show the nontaxable nature of payments received when the taxpayer does not dispute receipt of the payments in issue.[12] *Tokarski v. Commissioner*, 87 T.C. 74, 75–77 (1986).

The sham transaction doctrine requires courts and the Commissioner to look beyond the form of a transaction and to consider its substance. *Slone v. Commissioner*, 810 F.3d 599, 605 (9th Cir. 2015), *vacating and remanding* T.C. Memo. 2012-57. The sham transaction doctrine emerged from *Gregory v. Helvering*, 293 U.S. 465 (1935), in which the Supreme Court affirmed the Commissioner in denying deductions claimed by taxpayers in a corporate reorganization that had followed each step required by the Code. The Supreme Court held that this transaction was a "mere device" for the "consummation of a preconceived plan" and not a reorganization within the intent of the Code as it then existed. *Id.* at 469. Since then, the U.S. Courts of Appeals have expanded upon the sham transaction doctrine, creating generally analogous yet not identical standards. *See, e.g.*, *Rose v. Commissioner*, 868 F.2d 851, 853 (6th Cir. 1989), *aff'g* 88 T.C. 386 (1987); *Kirchman v. Commissioner*, 862 F.2d 1486, 1490–92 (11th Cir. 1989), *aff'g Glass v. Commissioner*, 87 T.C. 1087 (1986); *Rice's Toyota World, Inc. v. Commissioner*, 752 F.2d 89, 91 (4th Cir. 1985), *aff'g in part, rev'g in part, and remanding* 81 T.C. 184 (1983).

Two relevant forms of sham transactions exist: factual shams and economic shams. *Krumhorn v. Commissioner*, 103 T.C. 29, 38 (1994).

---

[12] Petitioner has not argued or otherwise established that the burden shifting provision of section 7491(a)(1) applies.

**[\*17]** Factual shams are purported transactions that never took place, while economic shams are transactions that lack economic substance. *Id.* In examining economic shams the U.S. Court of Appeals for the Ninth Circuit focuses on (1) the subjective inquiry of whether the taxpayer intended anything other than acquiring tax benefits (business purpose) and (2) the objective inquiry of whether the transaction had any practical economic effects beyond avoiding taxation (economic substance).[13] *Reddam v. Commissioner*, 755 F.3d 1051, 1059 (9th Cir. 2014), *aff'g* T.C. Memo. 2012-106. While not a rigid two-part test, the business purpose and economic substance prongs allow for a more holistic approach in determining a sham transaction. *Slone v. Commissioner*, 810 F.3d at 606; *Casebeer v. Commissioner*, 909 F.2d 1360, 1363 (9th Cir. 1990), *aff'g* T.C. Memo. 1987-628, *aff'g Moore v. Commissioner*, T.C. Memo. 1987-626, *aff'g Sturm v. Commissioner*, T.C. Memo. 1987-625, *and aff'g in part, rev'g in part Larsen v. Commissioner*, 89 T.C. 1229 (1987).

If a commonsense review of a particular transaction leads to the conclusion that the transaction does not have a nontax business purpose or any economic substance other than the creation of tax benefits, the form of that transaction may be disregarded, and the Commissioner may rely on its underlying economic substance for tax purposes.[14] *Slone v. Commissioner*, 810 F.3d at 606; *Reddam v. Commissioner*, 755 F.3d at 1061–62. Respondent contends that the SPAs were economic shams. As discussed in detail below, we agree.

A. *Business Purpose and Tax Motivation*

We look first to the business purpose prong, a subjective inquiry assessing whether petitioner had a business purpose for engaging in the

---

[13] Absent a stipulation to the contrary, this case is appealable to the Ninth Circuit. § 7482(b). We follow the precedent of that court that is squarely on point. *Golsen v. Commissioner*, 54 T.C. 742, 757 (1970), *aff'd*, 445 F.2d 985 (10th Cir. 1971).

[14] We acknowledge that the economic substance doctrine was codified in section 7701(o), effective for transactions entered into after March 30, 2010. *See* Health Care and Education Reconciliation Act of 2010, Pub. L. No. 111-152, § 1409(e)(1), 124 Stat. 1029, 1070. Respondent, however, has not invoked section 7701(o) in this case and has instead pointed us to the approach taken by the Ninth Circuit in characterizing transactions for tax purposes. Petitioner has similarly focused on the law of the Ninth Circuit, making no argument that section 7701(o) would dictate a different result but instead citing that section in support of the Ninth Circuit's approach. *See also Slone v. Commissioner*, 810 F.3d at 606 (describing section 7701(o) as having "codified a similar approach" to that of the Ninth Circuit). Consequently, we address section 7701(o) no further.

**[\*18]** transaction, other than tax avoidance. *Reddam v. Commissioner*, 755 F.3d at 1060. "The business purpose factor often involves an examination of the subjective factors which motivated a taxpayer to make the transaction at issue." *Bail Bonds by Marvin Nelson, Inc. v. Commissioner*, 820 F.2d 1543, 1549 (9th Cir. 1987), *aff'g* T.C. Memo. 1986-23.

The business purpose examination can be framed as whether the taxpayer was motivated by reasons solely connected to tax savings, or if the taxpayer had a nontax profit motive. *Reddam v. Commissioner*, 755 F.3d at 1060. A taxpayer's self-interested declarations are not accepted without question; rather, the Court considers all objective facts known to the taxpayer at the time, or the facts discoverable by the basic inquiry of a profit-motivated party. *Skeen v. Commissioner*, 864 F.2d 93, 95 (9th Cir. 1989), *aff'g Patin v. Commissioner*, 88 T.C. 1086 (1987). Regardless of the taxpayer's motives, however, a transaction with the sole function of the production of tax deductions is a sham. *Kirchman v. Commissioner*, 862 F.2d at 1492.

Before we can apply the sham transaction doctrine, we must define the transaction that must be tested. One approach is to broadly define the transaction, i.e., whether petitioner's settlements with D1, D2, and D3 were sham transactions when taking the broader context of the IP litigation and petitioner's business objectives into consideration. Conversely, another approach is to narrowly define the transaction, i.e., whether the SPAs, by themselves, were collectively, a sham transaction. We think it is appropriate to apply the latter approach because the parties' execution of the SPAs (transaction) is the operative transaction from which this dispute arises.[15] Below, we consider whether the SPAs had a business purpose and economic substance.

During settlement negotiations, petitioner offered D1, D2, D3, and D4 discounts to structure the settlements as stock purchases rather than as licensing agreements. Chu testified that he understood at the

---

[15] We note that, on brief, petitioner also appears to narrowly define the relevant transaction. Petitioner's opening and reply briefs focus on the validity of the SPAs and petitioner's business motivations behind them. *See* Pet'r's Pretrial Mem. (No. 160); Pet'r's Opening Br. (No. 177); Pet'r's Answering Br. (No. 182). Petitioner's arguments focus on its assertion that the payments made by D1, D2, and D3, were bona fide stock purchases and therefore the payments were properly characterized as capital contributions. Petitioner supports this assertion with several arguments that again focus on the characteristics and value of the Settlement Shares and the settling parties' allocation of the payments to the Settlement Shares.

**[\*19]** time that petitioner would not have to pay taxes on the payments if structured as stock purchases. Petitioner, however, asserts that the financial incentive to have defendants settle through stock purchases was to enlist the large technology firms as "partners." Per petitioner, it expected that the defendants, as shareholders, would provide the company with credibility and validity, while retaining a passive interest in Acqis's future success.

We find these asserted motivations unconvincing. While partnering with large technology firms may have served to amplify Acqis's stature and legitimacy, the terms of the SPAs barred Acqis from publicizing their new arrangements or disclosing the names of D1, D2, and D3.

We also find it noteworthy that petitioner offered the stock purchase structuring discount only to D1, D2, D3, and D4. Chu explained that he did not offer the stock purchase structuring discount to any of the other litigation defendants because the settlement amounts were "very small" and it would not be "worth the legal cost to go through that process." This explanation conflicts with petitioner's previously stated motivations. Chu testified that Acqis was seeking legitimacy and stature by partnering with large technology firms, while imbuing the firms with an interest in Acqis's ongoing success. The degree of success Acqis achieved with each of these goals would depend on the size of the firm with which it partnered and the firm's ability to amplify Acqis's legitimacy, not the size of the firm's investment. Gaining validity and credibility through partnerships would depend on the validity and credibility of Acqis's potential partner, a factor Chu did not mention as relevant to his decision regarding which firms would be offered an SPA structure.

A factor Chu did consider when structuring settlement payments, i.e., the size of the settlement payment itself, strikes us as counterintuitive as well. If large technology firm partners would grant Acqis credibility, validity, and passive support for future success such that Acqis was willing to pay (through a discounted settlement payment) the partners in pursuit of the alliance, surely the partnership itself was worth the legal cost to implement? Indeed, smaller settlement amounts would have benefited Acqis by costing the company a smaller discount while providing the same partnership value.

**[\*20]** Our review of petitioner's motivations leads us to conclude that Acqis did not have a business purpose for engaging in the transaction beyond the acquisition of tax benefits.

### B. *Economic Substance*

We next turn to the economic substance prong which "involves a broader examination of whether the substance of a transaction reflects its form, and whether from an objective standpoint the transaction was likely to produce economic benefits aside from a tax deduction." *Bail Bonds by Marvin Nelson, Inc. v. Commissioner*, 820 F.2d at 1549. The economic substance of a transaction, not its form, is controlling. *Gregory v. Helvering*, 293 U.S. at 470. Our task is to determine whether petitioner and D1, D2, and D3 have actually done what the documentation purports to do. *See Falsetti v. Commissioner*, 85 T.C. 332, 347 (1985). Looking to the totality of the facts and circumstances, factors we may consider in deciding whether a transaction has economic substance include (1) the FMV of the property involved; (2) the presence or absence of arm's-length price negotiations; (3) the relationship between sale price and FMV; (4) the financing structure; (5) whether the burdens of ownership shifted; and (6) whether the parties adhered to the terms of their contract. *See Rose*, 88 T.C. at 410–11; *Helba v. Commissioner*, 87 T.C. 983, 1004 (1986), *supplemented by* T.C. Memo. 1987-529, *aff'd*, 860 F.2d 1075 (3d Cir. 1988) (unpublished table decision); *Falsetti*, 85 T.C. at 348–53; *see also Sacks v. Commissioner*, 69 F.3d 982, 988–92 (9th Cir. 1995), *rev'g* T.C. Memo. 1992-596.

Petitioner asserts that the structure of the payments by D1, D2, and D3 has economic substance. The burden rests upon petitioner to prove this assertion. *See* Rule 142(a); *Welch v. Helvering*, 290 U.S. 111. Petitioner must demonstrate that the payments here in issue were in fact made to purchase Acqis stock and that the sales were likely to produce economic benefits aside from shielding Acqis from tax liability. *See Slone v. Commissioner*, 810 F.3d at 607; *Bail Bonds by Marvin Nelson, Inc. v. Commissioner*, 820 F.2d at 1549.

### 1. *FMV*

The FMV of an asset is the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts. *United States v. Cartwright*, 411 U.S. 546, 550–51 (1973); Treas. Reg. § 20.2031-1(b).

**[\*21]** Section 2031 and regulations thereunder provide general rules for property valuation for estate tax purposes, though the same valuation rules apply to income tax cases such as this. *See Philip Morris, Inc. & Consol. Subs. v. Commissioner*, 96 T.C. 606, 628 (1991), *aff'd*, 970 F.2d 897 (2d Cir. 1992). When a market valuation is unavailable, as is often the case with closely held corporations, the FMV is determined by considering "the company's net worth, prospective earning power and dividend-paying capacity, and other relevant factors." Treas. Reg. § 20.2031-2(f). Such factors include the economic outlook of the industry, the company's position in the industry, and the degree of control of the business represented by the group of shares being valued. *Id.* Furthermore, the valuation must also consider the "rights, restrictions, and limitations of the various classes of stock." *Estate of Newhouse v. Commissioner*, 94 T.C. 193, 218 (1990).

In general, "property is valued as of the valuation date on the basis of market conditions and facts available on that date *without regard to hindsight.*" *Estate of Gilford v. Commissioner*, 88 T.C. 38, 52 (1987). Subsequent events are not considered in fixing FMV, except to the extent that they were reasonably foreseeable on the valuation date. *Id.* at 52–53. Generally, valuations based on subsequent events that were not foreseeable on the valuation date are not helpful. *Messing v. Commissioner*, 48 T.C. 502, 509 (1967).

The determination of the FMV of property is a question of fact. *Sammons v. Commissioner*, 838 F.2d 330, 333 (9th Cir. 1988), *aff'g in part, rev'g in part* T.C. Memo. 1986-318. At trial we received opinion evidence from two expert witnesses, and we weigh their testimony in light of their qualifications as well as all other relevant evidence of value. *See Estate of Christ v. Commissioner*, 480 F.2d 171, 174 (9th Cir. 1973), *aff'g* 54 T.C. 493 (1970); *Estate of Gilford*, 88 T.C. at 56. The Court has broad discretion to evaluate "the overall cogency of each expert's analysis" but is not bound by the opinion of any expert witness and will accept or reject expert testimony in the exercise of sound judgment. *Helvering v. Nat'l Grocery Co.*, 304 U.S. 282, 295 (1938); *Sammons v. Commissioner*, 838 F.2d at 333–34 (quoting *Ebben v. Commissioner*, 783 F.2d 906, 909 (9th Cir. 1986), *aff'g in part, rev'g in part* T.C. Memo. 1983-200); *Estate of Hall v. Commissioner*, 92 T.C. 312, 338 (1989). In addition, we may be selective in deciding what parts (if any) of their opinions to accept. *See Gerdau Macsteel, Inc. v. Commissioner*, 139 T.C. 67, 158 (2012). As discussed herein, we generally find Anderson's conclusions to be more persuasive than those of Pellegrino.

**[\*22]** Petitioner's expert, Pellegrino, asserts that the value of the Settlement Shares at the time of settlement was $18.40 per share; respondent's expert, Anderson, asserts that the shares had a value of zero per share. The experts took different approaches to the valuation. Anderson set out to determine the value of the shares based on Acqis's projected income using a discounted cashflow analysis. Using Acqis's income between 2008 and 2012, Anderson determined a present value for Acqis's projected income for future years, including the discount rate to account for uncertainty regarding future income. Anderson also accounted for prior sales of Acqis stock and the market rate at which those sales occurred. Anderson then determined three different share values after adjusting for (1) the lack of rights, (2) the historical operating results, or (3) the adjusted operating results. Essentially, Anderson set out to determine the value that Acqis could extract from its operations, and what value the Settlement Shareholders could extract from Acqis by owning the Settlement Shares.

Petitioner's expert set out to determine the value of the Settlement Shares based on the value of Acqis's patent portfolio at the time of settlement. Pellegrino valued the patent portfolio using the number of patents held, the projected market sizes for the patents, and projected litigation success, while discounting for risk. The valuation did not adjust for the lack of liquidation, voting, guaranteed dividends, marketability, or transfer rights, deeming any such distinctions to have negligible impact on the value of the shares. Pellegrino essentially determined the potential future value of Acqis's assets and allocated that value to all shares while presuming equal access to it.

The Court has been presented with multiple potential values for the Settlement Shares: $Z per the SPAs, $18.40 per Pellegrino, and zero per Anderson. Investment Shareholders had also been paying between $0.06 and $0.10 per share of common stock as recently as 2009—one year before the first Settlement Shares were issued. In assessing the validity of each of these values as applied to the Settlement Shares, we return to a point first raised by Anderson: What value can the shareholders extract from Acqis through their ownership of the Settlement Shares?

In assessing the value of these shares, we are guided by factors that seek to value the company and its potential growth, as well as the potential for the shares to derive value for the shareholders from the company and its growth. As the Settlement Shares were nontransferrable and Acqis did not permit their sale, the Settlement

[*23] Shareholders were denied the opportunity to derive capital gains through appreciation in their shares by way of Acqis's growth. If Acqis were to successfully litigate all future patents, securing large settlements and overflowing coffers, the Settlement Shares, locked to their current owners, would not be able to convert this success into currency.

As the settlement shareholders have been denied the opportunity to realize income from disposing of the Settlement Shares, we turn to their eligibility to derive income from share ownership. *See* Treas. Reg. § 20.2031-2(f). Where bid and ask prices are unavailable, we determine this through the specific facts of the case, including the "degree of control of the business represented by the block of stock to be valued," and dividend-paying capacity. *Id.*; *see Estate of Newhouse*, 94 T.C. at 218.

Pellegrino asserts as a foundation of his analysis that Investment Shares and Settlement Shares have "identical value economically," attributing no valuation impact to restrictions on voting rights, dividend or distribution rights, or liquidation preference. We disagree. The Court has previously held that valuation must account for the rights, restrictions, and limitations of the classes of stock. *Estate of Newhouse*, 94 T.C. at 218. If the rights and powers of one class of stock are sufficient to significantly limit the ability of another class of stock to control the company and its assets, then the value of that other class of stock will be significantly less than if it enjoyed full and unrestricted control over corporate affairs. *Id.* The Court considers eligibility for redemption, liquidation rights, voting power, eligibility for dividends, and the power of shareholders to obtain eligibility for dividends in determining share value. *Id.* at 219–22.

Our review of the factors above leads us to determine that the Settlement Shares did not have economic value at the time of the settlements. The SPAs dictate petitioner's expectation and intention that the Settlement Shares will not receive dividends, do not have liquidation preference, are not transferrable or redeemable, and have no voting rights or other means to effect a change with respect to those absent rights. Acqis has created an instrument that looks like an equity share with none of its substance. In searching for words to describe Acqis's creation, we find ourselves comparing it to a ceremonial "Key to the City": It bears the appearance of an item we know well, but opens no doors, bestows no ownership or function, and is instead merely representational. Likewise, the Settlement Shares resemble shares in

[*24] form, but in function they grant no real benefits of ownership or income. We conclude that the Settlement Shares are worthless.

### 2.  *Arm's-Length Negotiations*

Likewise relevant to our inquiry is whether the parties conducted arm's-length negotiations in establishing the price of the Settlement Shares. *See Falsetti*, 85 T.C. at 349. The Court has previously reviewed for reasonable sale prices, evidence of attempts to negotiate, and evidence of investigation into a financial return by the purchasing party. *Helba*, 87 T.C. at 1005–07; *Falsetti*, 85 T.C. at 348–50.

As discussed *infra*, the sale prices grossly exceeded the FMV of the shares. D1, D2, and D3 did not negotiate with petitioner in setting the share price but only over the settlement amount needed to end the litigation. We see no indication that the parties conducted arm's-length negotiations in establishing the price of the Settlement Shares

### 3.  *Relationship Between FMV and Sales Price*

We next turn to the relationship between the FMV and the sale price of the Settlement Shares. *See Falsetti*, 85 T.C. at 351. We have previously determined the FMV to be zero, while the ostensible sale price for Settlement Shares was $Z per share. Even when looking at values asserted by Acqis, a value of $18.40 per share and a sale price of $Z do not align and are supplied with no explanation as to the disparity. The stark difference between these values militates against petitioner's contention that the stock purchases had economic substance.

### 4.  *Financing Structure of the Transaction*

We next consider the financing structure used by the participants. *Levy v. Commissioner*, 91 T.C. 838, 857–58 (1988); *Helba*, 87 T.C. at 1007–11. The financing structure for the settlements with D1, D2, and D3 was essentially the same. Each of D1, D2, and D3 entered into an MOU, an SA, and an SPA. The parties agreed that Acqis and the settling defendant would dismiss all pending litigation against each other, and the settling defendant would pay a specified sum to receive Settlement Shares (at $Z per share) and a perpetual nonexclusive license to use Acqis's patents. Chu chose the $Z share price on the basis of his estimate of Acqis's portfolio success in four or five years but did not have the shares valued. Both D2 and D3 designated Komen as the recipient of the Settlement Shares, and neither ever possessed any Acqis shares. The SA required the settling defendant to

[*25] cease any assistance to remaining parties to the First Patent Litigation and granted the settling defendant a perpetual license to use any current or future IP held by Acqis at no additional expense beyond the settlement payment.

Although the other First Patent Litigation Defendants did not receive shares or a right to acquire shares, the essential components of Acqis's settlements with D1, D2, and D3 generally match the other patent infringement litigation settlements and licensing fee payments from all other First Patent Litigation Defendants except for D6, which did not receive any license as part of its settlement. Aside from D6, each of the other defendants received a license to use petitioner's existing and/or future patents as an essential component of the settlement.[16] Payments from D1, D2, and D3 were paid into the Lawyer Trust Account. Cooley was paid a contingent fee out of the funds paid into that account, consistent with the agreement between Acqis and Cooley that Cooley would receive payment with respect to patent infringement enforcement, subsequent licensing transactions, or court awards (i.e., not stock sales). The remainder was then transferred to Acqis. This process did not align with Acqis's approach to prior stock purchases, for which Acqis hired a law firm on an hourly basis and directly traded shares for payment with shareholders.

The structure of the transactions with D1, D2, and D3 does not resemble that used with respect to other Acqis stock purchases. Instead, it is functionally equivalent to the process employed with respect to the other First Patent Litigation Defendants in pursuing patent infringement damages and licensing fees.

### 5. *Burdens and Benefits of Ownership*

In contemplating whether this transaction constitutes a stock sale, we must also consider whether the burdens and benefits of ownership have passed from seller to buyer. *See Falsetti*, 85 T.C. at 348.

---

[16] As discussed *supra*, as part of the settlements, D1, D2, D3, D4, D8, and D11 received a perpetual license to use petitioner's existing and future patents. Petitioner negotiated a narrower licensing arrangement with the other defendants that received licenses. D5, D7, and D9 received a perpetual license to use petitioner's existing and future patents related to the underlying patents in the First Patent Litigation while D10 received only a perpetual license to use petitioner's existing patents related to the underlying patents in the First Patent Litigation. The differences in the breadth of the license agreements received by the various defendants does not change our analysis.

**[\*26]** In the context of stock ownership, the "[b]enefits and burdens of stock ownership generally include sharing in the successes and failures of the corporation and receiving dividends." *Dunne v. Commissioner*, T.C. Memo. 2008-63, 95 T.C.M. (CCH) 1236, 1243 (first citing *Pac. Coast Music Jobbers, Inc. v. Commissioner*, 55 T.C. 866, 875–76 (1971), *aff'd*, 457 F.2d 1165 (5th Cir. 1972); and then citing *Yelencsics v. Commissioner*, 74 T.C. 1513, 1528 (1980)); *see also Anschutz Co. v. Commissioner*, 135 T.C. 78, 99 (2010) (citing the factors evaluated in *Dunne* to determine whether a transaction validly transferred stock ownership), *aff'd*, 664 F.3d 313 (10th Cir. 2011). This again is a question of fact that must be ascertained from the intention of the parties as evidenced by the written agreements. *Falsetti*, 85 T.C. at 349. As concluded *supra*, we see no evidence of any benefits of ownership transferring to D1 or to Komen, as they were unable to receive any financial gain from the ownership. Because of the restrictions on the Settlement Shares, they were unable to share in the success of the corporation and were not expected to receive dividends. It likewise appears no burdens of ownership shifted. Despite D1 and Komen collectively owning 13% of Acqis shares, the shareholders had no right to receive financial information, elect BOD members, or vote. Conversely, Acqis did provide such financial information and rights to smaller Investment Shareholders.

### 6. *Adherence to Contract Terms*

Finally, we look to see whether the parties conducted the transaction with a "complete disregard of contractual terms." *Helba*, 87 T.C. at 1004. Our review of the record reveals one instance we can identify where petitioner did not honor the terms of the contracts. The SPAs contained NDAs that barred Acqis from disclosing the defendants as shareholders. On one occasion in 2018 Chu disclosed D1's status as a shareholder of Acqis without D1's permission. This one instance, though likely contrary to the terms of the contract, does not amount to its "complete disregard."

### C. *Conclusion*

In all, the record convincingly shows that the parties sought to settle the patent infringement litigation, but the transaction (as defined above) served no purpose toward that goal and had no nontax effect. Instead, the SPAs were added as a legal fiction to achieve a desired result with respect to Acqis's tax liability. We find no evidence that petitioner was concerned with the real value of its shares or passing the

[*27] benefits and burdens of their ownership to D1, D2, or D3. The shares D1 acquired and that D2 and D3 transferred to Komen bore no value, in stark contrast to the price paid, with no attention paid to the price per share by D1, D2, or D3 during negotiations. Except for tax purposes, Acqis and Cooley treated the settlement payments from D1, D2, and D3 the same as the patent infringement damages and licensing fees resulting from the First Patent Litigation.

The SPAs were executed with the sole purpose of obtaining a tax benefit for Acqis and lacked any economic substance beyond that goal. What pretended to be a purchase of Acqis shares was really a settlement payment for patent infringement damages and a licensing fee. The transaction before us lacks both business purpose and economic substance and is a sham. Accordingly, the transaction will be disregarded.

II.  *The Payments from D1, D2, and D3 Are Taxable Gross Receipts.*

After holding that the SPAs are disregarded as a sham transaction, we now must examine the remaining component of the settlements, the SAs, to determine the payor's intent with respect to the settlement payments. The determination of the payor's intent will, in turn, dictate the tax consequences of the settlement payments to petitioner.

When a taxpayer receives damages from a settlement, "the tax consequences of the settlement depend on the nature of the claim that was the basis for the settlement, rather than the validity of the claim." *Cung v. Commissioner*, T.C. Memo. 2013-81, at *10 (quoting *Healthpoint, Ltd. v. Commissioner*, T.C. Memo. 2011-241, 102 T.C.M. (CCH) 379, 382); *see also United States v. Burke*, 504 U.S. 229, 237 (1992). The amounts paid in settlement should receive the same tax treatment as if the dispute had been litigated and reduced to judgment. *Freda v. Commissioner*, 656 F.3d 570, 574 (7th Cir. 2011), *aff'g* T.C. Memo. 2009-191. When a claim is resolved by settlement, the relevant question for determining the tax treatment of the settlement is: "In lieu of what were the damages awarded?" *Tribune Publ'g Co. v. United States*, 836 F.2d 1176, 1178 (9th Cir. 1988) (quoting *Raytheon Prod. Corp. v. Commissioner*, 144 F.2d 110, 113 (1st Cir. 1944), *aff'g* 1 T.C. 952 (1943)).

In determining in lieu of what the damages were awarded, the critical inquiry is the payor's intent at the time of settlement. *See*

[*28] *Metzger v. Commissioner*, 88 T.C. 834, 847–48 (1987), *aff'd*, 845 F.2d 1013 (3d Cir. 1988) (unpublished table decision); *Fono v. Commissioner*, 79 T.C. 680, 694, 696–98 (1982), *aff'd*, 749 F.2d 37 (9th Cir. 1984) (unpublished table decision). In making this inquiry we first look to the terms of the settlement agreement itself for indicia of the payor's intent as to the payment's purpose. *See Greer v. United States*, 207 F.3d 322, 329 (6th Cir. 2000); *Dulanto v. Commissioner*, T.C. Memo. 2016-34, at *6, *aff'd*, 703 F. App'x 527 (9th Cir. 2017); *Allum v. Commissioner*, T.C. Memo. 2005-177, 90 T.C.M. (CCH) 74, 77–78, *aff'd*, 231 F. App'x 550 (9th Cir. 2007). Where the agreement lacks express terms of purpose, the Court looks beyond the agreement to other evidence that may shed light on the payor's intent, *Greer*, 207 F.3d at 329; *Dulanto*, T.C. Memo. 2016-34, at *6–7; *Allum*, 90 T.C.M. (CCH) at 77–78, such as to the amount paid, the circumstances that led to the agreement, and any other facts that may reveal the payor's intent, *see, e.g.*, *Green v. Commissioner*, 507 F.3d 857, 868 (5th Cir. 2007), *aff'g* T.C. Memo. 2005-250; *Pipitone v. United States*, 180 F.3d 859, 864–65 (7th Cir. 1999); *Allum*, 90 T.C.M. (CCH) at 77–78. Ultimately, the character of the payment hinges on the payor's dominant reason for making the payment. *See Green v. Commissioner*, 507 F.3d at 868; *Allum*, 90 T.C.M. (CCH) at 77–78. Thus, even if the settlement documents do clearly allocate a payment, the Court may ignore such allocation when there is evidence that the payment represented something else. *Milenbach v. Commissioner*, 318 F.3d 924, 933–34 (9th Cir. 2003), *aff'g in part, rev'g in part on other grounds* 106 T.C. 184 (1996). As it has been aptly stated, "[w]hen assessing the tax implications of a settlement agreement, courts should neither engage in speculation nor blind themselves to a settlement's realities." *Id.* at 933 (quoting *Bagley v. Commissioner*, 121 F.3d 393, 395 (8th Cir. 1997)).

As direct proof of the payor's intent may not be available, the Court reviews the facts and circumstances surrounding the payment. *Bent v. Commissioner*, 87 T.C. 236, 245 (1986), *aff'd*, 835 F.2d 67 (3d Cir. 1987); *Allum*, 90 T.C.M. (CCH) at 77–78 (citing *Knuckles v. Commissioner*, 349 F.2d 610, 613 (10th Cir. 1965), *aff'g* T.C. Memo. 1964-33). Thus, absent express terms of the purpose of the payment in a settlement agreement, we consider other provisions in the settlement agreement documents as an element of the inquiry of the facts and circumstances of the payment. *Allum*, 90 T.C.M. (CCH) at 77–78 (citing *Knuckles v. Commissioner*, 349 F.2d at 613). We will review the agreement to interpret the intent of the parties, which is inferred from the four corners of the agreement if the contract is unambiguous. *U.S. Cellular Inv. Co. of L.A. v. GTE Mobilnet, Inc.*, 281 F.3d 929, 934

**[\*29]** (9th Cir. 2002). A contract is ambiguous if it is capable of two different reasonable interpretations. *CNH Indus. N.V. v. Reese*, 583 U.S. 133, 138 (2018); *Smith v. Commissioner*, 82 T.C. 705 (1984). Where a contract is ambiguous, the Court is free to consult extrinsic evidence to the contract, and the burden of proof falls to the taxpayer to prove that its interpretation is correct. *CNH Indus. N.V.*, 583 U.S. at 138; *Rink v. Commissioner*, 100 T.C. 319, 325–26 (1993), *aff'd*, 47 F.3d 168 (6th Cir. 1995).

In addition to considering settlement agreement documents to determine the intent of a payment, the Court has considered several factors in determining whether a payor intended a capital contribution. These factors include whether (1) the fee in question is earmarked for application to a capital acquisition or expenditure, (2) the payors are the equity owners of the corporation and there is an increase in the equity capital of the organization by virtue of the payment, and (3) the payors have an opportunity to profit from their investment in the corporation. *Bd. of Trade of City of Chicago & Subs. v. Commissioner*, 106 T.C. 369, 386 (1996). Payments for shares have been held not to be capital contributions where the shares lacked the attributes of stock, such as rights to pro rata dividends or growth in the corporation during its life and where payors were not informed of their right to vote for management and share in the assets of the corporation upon liquidation. *See Affiliated Gov't Emps.' Distrib. Co. v. Commissioner*, 322 F.2d 872, 877 (9th Cir. 1963), *aff'g* 37 T.C. 909 (1962); *see also, e.g.*, *Commissioner v. Scatena*, 85 F.2d 729, 732 (9th Cir. 1936) (characterizing stock as an "interest or right which the owner has in the management, profits and assets of a corporation"), *aff'g* 32 B.T.A. 675 (1935).

As discussed, because the SPAs are disregarded, we are left to analyze the SAs to determine the defendants' intent for making the settlement payments. The SAs state that petitioner sued each defendant for patent infringement and that the parties desired to settle the patent infringement litigation. As part of the settlement of the patent infringement litigation, petitioner and each defendant agreed that the defendant would acquire a perpetual nonexclusive license and would purchase the Settlement Shares pursuant to an SPA. The parties also agreed to mutual releases, and petitioner agreed to dismiss the patent infringement litigation against each defendant. Although it is clear from the SAs that each defendant executed the SA to generally settle the patent infringement claims that petitioner asserted against it, the SAs do not state the allocation of such payments and, except for D3's SA, do not state the total consideration to be paid.

**[\*30]** Each SA provided that the consideration paid in exchange for the settlement was for a license and an investment in petitioner (through the SPA). The SA, however, does not allocate the consideration as between these two items. A clear allocation in the SA of the settlement consideration as between these two items would have been an indication of the payor's intent in making the settlement payment. Absent a statement of the total consideration to be paid and an allocation of the consideration, the SA is ambiguous as to the payor's intent in making the settlement payment. Thus, we examine indirect evidence of payor intent by applying the circumstantial factors in *Board of Trade*, which we view as illuminating the intent of D1, D2, and D3 in making the settlement payments.

Of the circumstantial factors raised as indirect evidence of payor intent in *Board of Trade*, we have already concluded that the Settlement Shareholders are not equity owners of Acqis and that the payors do not have an opportunity to profit from the corporation. *See supra* Opinion Part I.C. As for earmarking the payments, Acqis instead distributed most of the funds received as a "reward" for Investment Shareholders, retaining part for daily operating expenses. We see no evidence that Acqis applied the funds to a capital acquisition or expenditure.

We likewise find no evidence that D1, D2, and D3 intended for their payments to buy shares or serve as capital contributions. The record reflects that the payments were for damages for petitioner's patent infringement claims and to buy perpetual nonexclusive licenses for petitioner's patents. As part of the MOU, the SA, and the SPA, petitioner and each of D1, D2, and D3 agreed that Acqis and the settling defendant would dismiss all pending litigation against each other and the settling defendant would receive Settlement Shares at $Z per share and a license to use Acqis's patents. D2 and D3 never accepted the shares offered by Acqis, receiving only licenses, and donated the shares to charity. Nor did D2 and D3 claim charitable contribution deductions for assigning the shares to Komen. Instead, D2 and D3 allocated their settlement payments to licensing fees for their own financial reporting and claimed business deductions. D1, D2, and D3 have provided statements to the effect that they never sought to become shareholders of Acqis and would have made the settlement payments with or without the SPA component. These considerations leave little doubt that D1, D2, and D3 intended the settlement payments (1) as damages to settle petitioner's patent infringement claims and (2) to buy perpetual nonexclusive licenses, not shares. The settlement payments are therefore taxable gross receipts to petitioner. *See* § 61(a)(6); *Schmitt v.*

[*31] *Commissioner*, 271 F.2d 301, 303–05 (9th Cir. 1959), *aff'g* 30 T.C. 322 (1958); *Raytheon Prod. Corp.*, 1 T.C. at 960–62.

III.     *The Six-Year Period of Limitations Applies.*

Generally, any tax imposed by the Code must be assessed within three years after the return was filed.  § 6501(a).  However, a six-year period of limitations applies if a taxpayer omits from gross income an amount properly includible therein which exceeds 25% of the amount of gross income stated in the return.  § 6501(e).  For a trade or business, gross income is defined for this purpose as the total amount received from the sale of goods or services, without taking into account the decrease for any cost of sales or services.  § 6501(e)(1)(B)(i).  "Gross income" is thus equated with gross receipts.  *Insulglass Corp. v. Commissioner*, 84 T.C. 203, 210 (1985).  In interpreting the predecessor to section 6501(e), the Supreme Court has stated that Congress intended the section to grant the Commissioner additional time where a taxpayer's omission on the return puts the Commissioner at a special disadvantage in detecting errors. *Colony, Inc. v. Commissioner*, 357 U.S. 28, 36 (1958).

Having established that the settlement payments from D1, D2, and D3 were income to petitioner, we turn to see whether that income exceeds the threshold set forth in section 6501(e).  Initially, we note that the period of limitations in section 6501(e) is in issue only for tax years ending November 30, 2010 through 2012 and not for the tax year ending November 30, 2015.  The record in this case supports a determination that the relevant amounts of gross receipts omitted for petitioner's tax years ending in November 2010, 2011, and 2012, respectively, exceed 25% of the gross receipts reported on the Forms 1120 for those years. *See supra* note 3.  Accordingly, the requirements of section 6501(e) are met and the six-year limitations period applies.

Petitioner asserts that the three-year limitations period applies and that the proposed adjustments with respect to the tax years ending November 30, 2010, 2011, and 2012 are time barred because it adequately disclosed the omitted income on its returns.  "In determining the amount omitted from gross income . . . , there shall not be taken into account any amount which is omitted from gross income stated in the return if such amount is disclosed in the return, or in a statement attached to the return, in a manner adequate to apprise the Secretary of the nature and amount of such item."  § 6501(e)(1)(B)(iii).  Thus, "adequate disclosure" of the nature and amount of the transaction

**[\*32]** protects the taxpayer from the application of the six-year limitations period. *CNT Invs., LLC v. Commissioner*, 144 T.C. 161, 214 (2015); *Estate of Fry v. Commissioner*, 88 T.C. 1020, 1022 (1987). The disclosure must be made in the original return or an attachment to it. § 6501(e)(1)(B)(iii); *Houston v. Commissioner*, 38 T.C. 486 (1962). Adequacy of the disclosure is determined using a reasonable person standard and is not based on the expertise of the reviewer. *Univ. Country Club, Inc. v. Commissioner*, 64 T.C. 460, 469–71 (1975).

The Court has long addressed what degree of disclosure is required. The taxpayer need not recite every aspect of the transaction, but the disclosure must be more substantial than simply providing a clue "sufficient to intrigue a Sherlock Holmes." *George Edward Quick Tr. v. Commissioner*, 54 T.C. 1336, 1347 (1970), *aff'd per curiam*, 444 F.2d 90 (8th Cir. 1971). Disclosure must therefore provide enough information so as to allow selection of the return for audit to be a reasonably informed process. *Estate of Fry*, 88 T.C. at 1023. Where the Commissioner must thoroughly scrutinize the return to determine whether income was omitted or the return was misleading, disclosure is inadequate. *Highwood Partners v. Commissioner*, 133 T.C. 1, 22 (2009). The question of adequate disclosure is one of fact, and the burden of proving adequacy in both nature and amount of omitted income falls to the taxpayer. *Whitesell v. Commissioner*, 90 T.C. 702, 707–08 (1988); *Univ. Country Club, Inc.*, 64 T.C. at 468.

Petitioner made two relevant disclosures on its returns for the years in question. On line 22b of Schedule L, Acqis reported increases to common stock shareholder equity. Petitioner also reported "Legal Settlement Fees" under the cost of goods sold on Statement 5 attached to its Schedule A on its 2009 and 2010 Forms 1120 and on Statement 12 attached to its Form 1125-A, Cost of Goods Sold, that was attached to its 2011 Form 1120. The disclosures end there. Petitioner's returns do not connect the increases in shareholder equity to the legal settlement fees, nor do they connect petitioner's business model with legal settlements. Instead, the returns state that petitioner's business activity was computer sales and development on the 2009 Form 1120, and patent royalties on the 2010 and 2011 Forms 1120.

These clues are insufficient to "apprise the Secretary of the nature and amount" of the omitted income. *See* § 6501(e)(1)(B)(iii). While petitioner did disclose increases to common stock shareholder equity, the values did not match amounts received from D1, D2, and D3 during the respective years as settlement payments, further obfuscating any

**[\*33]** disclosure. Petitioner also reported "Legal Settlement Fees" as costs of goods sold on their returns but did not disclose their business model as a nonpracticing patent licensing entity. While there are clues, mere disclosure of expenses related to an activity does not provide an adequate clue that the taxpayer omitted income from that activity. *Hines v. Commissioner*, T.C. Memo. 1989-17, 56 T.C.M. (CCH) 1050, 1053, *aff'd*, 893 F.2d 1330 (3d Cir. 1989) (unpublished table decision).

Moreover, these disclosures were misleading. Disclosures may provide a clue to omitted income, but misleading disclosures do not adequately apprise the Commissioner of the nature and amount of an item. *Benson v. Commissioner*, T.C. Memo. 2006-55, 91 T.C.M. (CCH) 925, 928, *supplementing* T.C. Memo. 2004-272, *aff'd*, 560 F.3d 1133 (9th Cir. 2009). The Court in *Estate of Whitlock* summed up the issue succinctly in concluding that there are "too many missing fact links in the logical chain connecting the items actually disclosed to the ultimate disclosure that [the taxpayers] had omitted amounts from the gross income stated on their return." *Estate of Whitlock v. Commissioner*, 59 T.C. 490, 511 (1972), *aff'd in part, rev'd in part on other grounds*, 494 F.2d 1297 (10th Cir. 1974). The factual gaps between reporting an increase in shareholder equity and legal fees paid, and payments received for patent infringement damages and licensing agreements disguised as sales of stock, are substantial.

Looking to analogous cases confirms the inadequacy of petitioner's disclosures. The Court has previously found that the reporting of a stock redemption transaction by a closely held corporation as a cash sale to a presumably unrelated party was an inadequate disclosure. *Estate of Fry*, 88 T.C. at 1023. Likewise, the Court has held that a nondetailed listing of assets as of yearend was insufficient disclosure to enable the Commissioner to determine whether a corporation had any earnings invested in U.S. property or increases in such earnings. *Estate of Whitlock*, 59 T.C. at 510–11. At a more granular level, the Court has held that the disclosure of gold mining development expenses for the operator of a gold mine was not adequate disclosure of omitted income from mining gold and that, in fact, the taxpayers had made no disclosure at all. *Hines*, 56 T.C.M. (CCH) at 1053. In contrast the Court has also held that incorrect treatment of a transaction, while still accurately reflecting the transaction, was an adequate disclosure. *Walker v. Commissioner*, 46 T.C. 630, 639–40 (1966). Petitioner's disclosure of clues failed to disclose the true nature of the transaction and lies firmly among cases where the six-year period of limitations has applied.

**[\*34]** In contending that the extended period does not apply, petitioner asserts that adequate disclosure does not require the taxpayer to abandon its position that an amount received is not includible in gross income. *See id*. at 640 n.8. While petitioner's assertion is true, achieving an adequate disclosure need not be viewed in such absolutes; petitioner could have adequately disclosed the nature of the transaction and the amount of omitted income, but it did not. Chu's testimony on the history of the patent litigation, settlement negotiation, and decision to structure the settlements as SPAs certainly shows petitioner's ability to disclose the nature of the transaction and amounts omitted while standing by Acqis's original position. We conclude that the disclosure is inadequate.

IV.    *Respondent's Determination of Accuracy-Related Penalties Is Sustained*.

Pursuant to section 6662(a), a taxpayer may be liable for a penalty of 20% on the portion of an underpayment of tax attributable to a substantial understatement of income tax. § 6662(b). In the case of a corporation, a substantial understatement of income tax is defined as an understatement of tax that exceeds the lesser of (i) 10% of the tax required to be shown (or, if greater, $10,000) on the tax return or (ii) $10 million. *See* § 6662(d)(1)(B). In general, the term "understatement" means the excess of the tax required to be shown on a return for the tax year over the tax shown on the return. § 6662(d)(2)(A). Generally, pursuant to section 7491(c), the Commissioner must provide sufficient evidence indicating the imposition of the accuracy-related penalty is appropriate and that the taxpayer's underpayment was attributable to a substantial understatement. *Higbee v. Commissioner*, 116 T.C. 438, 446–47 (2001). However, section 7491(c) applies only to individual taxpayers and does not apply to corporate taxpayers, such as petitioner. *See NT, Inc. v. Commissioner*, 126 T.C. 191, 195 (2006). Accordingly, respondent does not have any burden of production under section 7491(c), and petitioner has the burden of proving the accuracy-related penalties do not apply.[17]

---

[17] Although respondent bears no burden of production here, including with respect to the section 6751(b) supervisory approval requirement, *see Dynamo Holdings v. Commissioner*, 150 T.C. 224, 237 (2018), we note that petitioner has stipulated that the section 6751(b) requirement has been satisfied.

**[\*35]** For the tax years ended in November 2010, 2011, 2012, and 2015,[18] respondent determined that petitioner is liable for accuracy-related penalties attributable to substantial understatements of income tax.[19] On the basis of the updated amounts includible in gross income as established above, petitioner's understatements for the years in question are as follows:

|  | Tax Shown on Return | Tax Required to Be Shown on Returns | Understatement of Tax | 10% of Tax Required to be Shown on Return |
|---|---|---|---|---|
| 2010 | -0- | $5,003,457 | $5,003,457 | $500,345.70 |
| 2011 | $16,138 | 2,976,235 | 2,960,097 | 297,623.50 |
| 2012 | -0- | 4,777,425 | 4,777,425 | 477,742.50 |
| 2015 | 6,210 | 241,511 | 235,301 | 24,151.10 |

In the event of a substantial understatement, however, the taxpayer may escape the penalty under certain circumstances. First, a taxpayer does not owe a penalty where the taxpayer can identify "substantial authority" supporting its treatment of an item of income. § 6662(d)(2)(B)(i). Second, a taxpayer does not owe a penalty where the taxpayer can demonstrate that the relevant facts affecting the item's tax treatment are adequately disclosed in the return or an attachment to the return and there was a reasonable basis for the tax treatment of the item by the taxpayer. § 6662(d)(2)(B)(ii). Finally, to the extent that the taxpayer had reasonable cause for its position and acted in good faith, the penalty also does not apply. § 6664(c)(1). As discussed below, petitioner argues that the accuracy-related penalties should not apply because (1) it had substantial authority for its position and (2) it demonstrated reasonable cause for its position and acted in good faith.

First, petitioner asserts that it had substantial authority to support its position that the proceeds from the Settlement Share purchases were not taxable. Petitioner argues that section 118, which

---

[18] Respondent determined penalties for tax year ending November 30, 2015, as a computational adjustment related to the deficiencies from tax years ending November 30, 2010 through 2012.

[19] Respondent states that the accuracy-related penalties under section 6662(a) for the tax years ending November 30, 2011 and 2012, were understated because they were calculated after the application of NOL carrybacks from the tax years ending November 30, 2013 and 2014, which were not available at the time the returns for the tax years ending November 30, 2011 and 2012, were filed. Resp't's Opening Br. 1 n.* (No. 176). However, respondent is not seeking to increase the amounts of those accuracy-related penalties. The amounts in the table reflect the amounts from the notice of deficiency without excluding the NOL carrybacks.

**[\*36]** provides that the gross income of a corporation does not include any contribution to capital, and section 1032, which provides that a corporation recognizes no gain or loss on the receipt of money in exchange for stock, and their related regulations support its position. In particular, petitioner quotes Treasury Regulation § 1.1032-1(a) as support. That regulation provides that "[t]he disposition by a corporation of shares of its own stock . . . for money or other property does not give rise to taxable gain or deductible loss to the corporation regardless of the nature of the transaction or the facts and circumstances involved." Petitioner's argument seems to be elevating form over the actual substance. Nonetheless, we have already held that the structured stock sales lacked economic substance and are disregarded. The record shows that the parties sought to settle the patent infringement litigation and provide patent licenses, with the transaction (as defined above) added as a legal fiction to achieve a desired result with respect to Acqis's tax liabilities. We reject petitioner's reliance on Treasury Regulation § 1.1032-1(a) as support for its position in the light of our analysis that the transaction lacked economic substance and is disregarded. *Cf. Affiliated Gov't Emps.' Distrib. Co.*, 37 T.C. at 918 (evaluating the "real nature" of amounts paid to taxpayer to determine whether section 1032 applied to those amounts). Petitioner does not make any other argument that it had substantial authority to support its reporting, or lack thereof, with respect to the settlement proceeds it received from D1, D2, and D3. Accordingly, petitioner has not demonstrated that it had substantial authority for its treatment of those proceeds.

In addition petitioner asserts that it had reasonable cause for its position and that it acted in good faith. Specifically, Acqis had its returns for the years in question prepared by an accounting firm. Reliance on the advice of a professional tax adviser may, but does not necessarily, establish reasonable cause and good faith. Treas. Reg. § 1.6664-4(b)(1), (c). A taxpayer must prove by a preponderance of the evidence three elements in order to show that reliance on advice was reasonable: "(1) The adviser was a competent professional who had sufficient expertise to justify reliance, (2) the taxpayer provided necessary and accurate information to the adviser, and (3) the taxpayer actually relied in good faith on the adviser's judgment." *DJB Holding Corp. v. Commissioner*, 803 F.3d 1014, 1030 (9th Cir. 2015) (quoting *Neonatology Assocs., P.A. v. Commissioner*, 115 T.C. 43, 99 (2000), *aff'd*, 299 F.3d 221 (3d Cir. 2002)), *aff'g WB Acquisition, Inc. v. Commissioner*, T.C. Memo. 2011-36. However, "[t]he mere fact that a certified public accountant has prepared a tax return does not mean that he or she has

**[\*37]** opined on any or all of the items reported therein." *Neonatology Assocs.*, 115 T.C. at 100.

Acqis has not demonstrated by a preponderance of the evidence that the three-prong test in *Neonatology Associates* has been satisfied. First, nothing in the record indicates the accounting firm knew Acqis's reasons for engaging in the transaction or for structuring it as a sale of stock. *See* Treas. Reg. § 1.6664-4(c)(1)(i) (listing the taxpayer's purposes, and the relative weight of such purposes, for entering into a transaction and structuring it in a particular manner as information the adviser must consider). More importantly, Acqis concedes never having asked the accounting firm for an opinion on the validity of the transaction. *See DJB Holding Corp. v. Commissioner*, 803 F.3d at 1030. Instead, the record reveals only that the accountant prepared tax returns for the transaction on the basis of how Acqis portrayed the transaction and provided information. Petitioner has not met its burden of showing reasonable reliance on the accounting firm's advice. *See Higbee*, 116 T.C. at 449; Treas. Reg. § 1.6664-4(b)(1); *Higbee*, 116 T.C. at 449.

Petitioner also asserts that it acted in good faith. The decision as to whether the taxpayer acted with reasonable cause and in good faith depends upon all the pertinent facts and circumstances. *See* Treas. Reg. § 1.6664-4(b)(1). Relevant factors include the taxpayer's efforts to assess his proper tax liability, including the taxpayer's reasonable and good faith reliance on the advice of a professional such as an accountant. *See id.* Further, an honest misunderstanding of fact or law that is reasonable in light of the experience, knowledge, and education of the taxpayer may indicate reasonable cause and good faith. *Higbee*, 116 T.C. at 449 (citing *Remy v. Commissioner*, T.C. Memo. 1997-72).

Petitioner structured stock sales that lacked economic substance in order to characterize its receipt of payments for the settlement of patent infringement litigation and licenses as nontaxable contributions to capital. *See supra* Opinion Part I.C. Petitioner has provided explanations for the stock sale structure that are counterintuitive and contrary to both the economic reality of the transaction and the contract terms agreed therein. *See supra* Opinion Part I.A. These are not actions taken with reasonable cause in good faith.

Citing *Rolfs v. Commissioner*, 135 T.C. 471, 495-96 (2010), *aff'd,* 668 F.3d 888 (7th Cir. 2012), petitioner counters that, whether Acqis's treatment of the transaction is correct, it is not unreasonable as they have shown that a reasonable argument can be made in support of their

**[\*38]** position.  We disagree.  The Court in *Rolfs* was called upon to rule on an area of law that was unsettled at the time.  *Id.* at 496.  The Court has consistently acknowledged unsettled law to be a factor in favor of reasonableness for taxpayers trying to navigate their own liability.  *Patel v. Commissioner*, 138 T.C. 395, 417 (2012); *Rolfs*, 135 T.C. at 496.  The law regarding sham transactions, however, emerged from *Gregory v. Helvering* in 1935.  Although the law regarding sham transactions is complex, it was hardly unsettled when petitioner filed its returns.  *See supra* Opinion Part I.A; *see DJB Holding Corp. v. Commissioner*, 803 F.3d at 1030–31.

Because petitioner has not met its burden of proving that it had substantial authority or reasonable cause for the position that the settlement payments were nontaxable contributions to capital, we sustain respondent's imposition of the accuracy-related penalties for petitioner's taxable years ending November 30, 2010, 2011, 2012, and 2015, under section 6662(a) and (b)(2).[20]

We have considered the parties' other arguments and, to the extent they are not discussed herein, find them to be irrelevant, moot, or without merit.

To reflect the foregoing,

*Decision will be entered under Rule 155.*

---

[20] Respondent, on brief, argued that petitioner could not assert any defenses to the accuracy-related penalties because the income was attributable to a "tax shelter" as defined in section 6662(d)(2)(C)(ii).  Because we find that no defenses apply to the imposition of the accuracy-related penalties, we do not address whether the transaction at issue constituted a tax shelter.